BUDGET RENT–A–CAR CORPORA-
TION OF AMERICA, Appellant,

v.

Samuel FEIN, Appellee.

No. 21259.

United States Court of Appeals
Fifth Circuit.

March 5, 1965.

Robert Marks, Chicago, Ill., Nolan B. Harmon, Atlanta, Ga., Marks, Marks & Kaplan, Chicago, Ill., of counsel, for appellant.

Edward J. Henning, Joseph W. Gerstein, and Henning & Martin, Atlanta, Ga., for appellee.

Before BROWN and BELL, Circuit Judges, and SPEARS, District Judge.

JOHN R. BROWN, Circuit Judge.

In this diversity case the question is whether the District Court properly granted summary judgment in favor of the Defendant Fein refusing to enforce a restrictive covenant signed by Fein during negotiations over the possible purchase of a Budget rental car franchise by Fein, which for two years prohibited him from thereafter going into the discount car rental business anywhere in the western hemisphere. Signing the letter was in consideration of Fein's being shown confidential documents which presumably revealed certain operational techniques—calculated to show the profit making potential of Budget franchise. There is also an Erie-Klaxon [1] problem whether the District Court sitting as a Georgia court should, under the applicable Georgia conflict of laws rule, apply the substantive law of North Carolina (where the contract was executed) or that of Georgia (where the alleged breach occurred and the forum state). And as a subsidiary to that, there is a question what the Georgia courts would say about what is the substantive, non-statutory, law of North Carolina—that which the North Carolina courts say, or what the Georgia courts say is *the* common law. We have concluded that summary judgment was proper and affirm.

Budget Rent-A-Car, an Illinois corporation, is in the business of franchising and servicing operators in the discount automobile rental business. It sells its name and know-how to locally owned rental agencies for an initial franchise fee and a continuing monthly fee based upon the number of cars in service. According to its spokesmen and much of the literature furnished to Fein on a "confidential" basis, which is now pretty largely a cat-out-of-the-bag by reason of this litigation, Budget has unique attraction. By operating through locally owned units situated on less choice—and therefore less expensive—sites, manned by minimum staffs, and backed up by national advertising, it claims that it has been able to compete favorably with Hertz and Avis, who have largely dominated the market but who also have to charge their customers substantially higher rental fees. At the time this litigation was commenced, Budget had 63 franchises located in 30 states, two cities in Canada, and one in San Juan, Puerto Rico. Budget regards its knowledge of how to start and operate successfully a local rental agency, accumulated from and through its franchisees over several years, as something in the nature of a "trade secret." Consequently it has been the consistent practice of Budget when negotiating with a prospective franchise purchaser—as in this case—to require

1. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Klaxon Co. v. Stentor Elec. Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.

the signing of the standard agreement.[2] Only the items [2] and [4] of the agreement are involved in this suit, for there is no direct contention that Fein has [1] divulged any information given him and certainly none that he has [3] wrongfully used the name "Budget." The controversy centers about the item [2], namely, the agreement "not to enter into any daily discount automobile rental business in the western hemisphere for a period of two years * * *."

At the time the negotiations took place Fein resided in North Carolina where he was in the wholesale meat business. On deciding to sell this business and occupy himself otherwise, he contacted the President of Budget, Mr. Lederer, with whom he had formerly been associated and inquired about the possibility of a franchise. In June of 1961 Lederer came to Fein's home in North Carolina, and before discussing the deal, required Fein to sign the letter (note 2) containing the restrictive covenant. Fein was then given a disclosure of some aspects of the business. According to Lederer's answers to written interrogatories, the material shown Fein "included sales techniques, financial operations material, cash flow schedules for breakeven points, projections showing investment required related to fleet requirement, utilization charts and quarterly projections." [3]

The discussion and subsequent correspondence was primarily about a possible franchise in either Indianapolis or At-

---

2. To simplify discussion we have inserted the numbers in brackets, e.g. [1], [2]:
"Rent-A-Car Services Corporation
  35 East Wacker Drive
    Chicago 1, Illinois
Gentlemen:
"This letter will confirm my interest in obtaining a franchise for the 'Budget Rent-A-Car's operation. I am not familiar with the daily automotive discount rental business and desire to be completely informed of the operations, economics, trade secrets, financing and other important factors of such business.
"Recognizing that the above are valuable business and property rights, and in consideration of the disclosure by you of this information which is necessary to enable me to evaluate the business and my further interest in it, I [1] agree that none of the information disclosed to me will be divulged to any person or organization, [2] agree not to enter into any daily discount automotive rental business in the western hemisphere for a period of two years without your written permission, [3] agree never to use the 'Budget' name or a name similar thereto in connection with any automotive rental business without your written consent; and [4] further agree that if I directly or indirectly enter into such daily discount automotive rental business without your written consent, I will pay as liquidated damages the sum of $17.50 per 1,000 population in the metropolitan area of the city or cities in which such business is operated, and in addition, the further sum of $5.00 per month per each vehicle used in operation of such business.

"It is understood that the daily discount automotive rental business refers to one in which the rates are below those generally used by the Hertz and Avis systems. It is also understood that this letter does not create any relationship or obligation between us except as specifically described. You may rely upon the above in making the appropriate information available to me.
        Very truly yours,
        (S.) SAMUEL FEIN."

3. The material stressed the location of the rental agency offices at locations off airport premises and thus away from high priced (10 to 15%) concession commissions, and required participation by at least one of the investor-franchisees. There were elaborate schedules showing the investment, revenues, expenses in operations in increments of 25, 35, 50, 75, 100 cars, etc., the volume of rentals required to generate a cash flow for breakeven point and percentage of profits in excess thereof. Some of these were extracts from operating statements of several franchise holders. But none of this material revealed in this record told *how* the franchisee was to operate to get the volume to produce the cash flow or how the expenses were to be kept low enough for the cash to flow.
If anything more esoteric or valuable was furnished, its nature or significance does not appear in this record.
As such, the disclosure was essentially the perfectly legitimate promotional material attractively presented to induce a prospect to want to acquire a franchise to reap prospective profits.

lanta. Shortly thereafter Lederer advised Fein that the Indianapolis deal would probably be unavailable to him. He then encouraged Fein to consider Atlanta more seriously. But Fein's interest was short lived. About two weeks later (late June 1961) Fein wrote Lederer and announced that he was no longer interested in obtaining a Budget franchise, but asked his friend Lederer to recommend him for selling jobs. In January 1962, presumably by wholly independent negotiations, Budget granted the Atlanta franchise to someone else. In the fall of 1962, Fein acquired a franchise from Econo-Car International, another discount car rental company, and began operations in Atlanta.[4] For our purposes we assume that Econo-Car was operated similarly to Budget, renting compacts and other cars at prices substantially lower than those charged by Hertz and Avis, and that the two appealed to the same competitive market. We may also accept the optimistic estimate that the combined competitive effect of the two discount rental agencies had caused Hertz and Avis to lower their prices—at least for "weekend specials" —all to the benefit of the Atlanta area car rental users.

There is no positive demonstration that in his Atlanta operation Fein is actually using any of the confidential information shown him after signing the covenant either to his advantage or to the disadvantage of the Atlanta Budget franchisee, his competitor. On the other hand, Budget, at this stage, insists it does not know since the case has ended prior to discovery and trial. But in any event, the fact that Fein is in competition with a Budget franchisee is not particularly important as far as this agreement is concerned. First, in the language of the letter, breach of the covenant is not in any way hinged to

Fein's being in direct competition with Budget. Second, if Fein had not taken the Atlanta Econo-Car franchise, it is reasonable to assume someone else— equally as capable a competitor—would have. Budget's claim for damages,[5] then, depends on the bald fact that Fein's conduct comes literally within the language of item [2] of the restrictive covenant, that both in time and area he went into the discount auto rental business during the forbidden two-year period at a place within the western hemisphere.

Both parties moved for summary judgment, the Defendant's theory being that North Carolina law was controlling and that as a matter of public policy there, this restrictive covenant would be unenforceable—primarily because of the "unreasonable" breadth of the territorial restriction. The Trial Court agreed, granting the Defendant's motion and denying that of the Plaintiff. In his opinion order, Judge Morgan stated:

"The contract is unreasonable, not necessary for the protection of the party in whose favor the restraint was imposed, oppressive to the party restrained, and opposed to the interest of the public. Accordingly the contract is contrary to public policy and void."

He found this restrictive covenant to be analogous to the generally prohibited class of contract provisions which restrain an employee from engaging in the same business as his employer for a certain period of time following termination of his present employment. Budget has appealed and asks that the case be reversed and remanded with instructions to enter judgment in its favor on its motion, or, in the alternative, for a trial.

Budget insists that Georgia law must control the validity of this restrictive covenant. The Trial Court applied North Carolina law and Fein strongly asserts

---

4. Apparently Fein's corporation, Econo-Car of Georgia, Inc., held the Georgia franchise, and the Atlanta business was conducted through its wholly owned subsidiary, Three Dollars and Ninety-Five Cents-A-Day Rent-A-Car System, Inc.

5. A liquidated amount as damages was sought according to the formula contained in item [4] of the letter agreement (note 2, supra). No injunction was requested.

the correctness of this holding. Since the general rules in both states are similarly stated and there are no cases factually on all-fours with the instant one, we think it makes little or no difference which state's law is applied. It may be that as briefed and argued to us the cases found and cited by the parties might indicate that Georgia is the more liberal in enforcing restrictive covenants. Ironically, our consideration of recent cases not cited tends to reveal either that it makes no difference or that the opposite is true and North Carolina is the more liberal.[6]

⬛ Despite the practical non-necessity to choose, to technically comply with the Erie-Klaxon command, we have determined that Georgia law is applicable. The Trial Court based its decision that North Carolina law was applicable on the Georgia conflict Code provision on contracts:

> "The validity, form, and effect of all writings or contracts are determined by the laws of the place where executed. When such writings or contracts are intended to have effect in this State, they must be executed in conformity to the laws of this State, * * *."[7]

Except for the possibility, urged by the Plaintiff and here rejected,[8] that this agreement was "intended to have effect" in Georgia, § 102 would appear to call for the application of North Carolina law because that was the place of execution. But Plaintiff argues and the decisions certainly tend to indicate that the reference in § 102 (note 7, supra) to the *"laws* of the place where executed" as being determinative of "validity, form, and effect" has been interpreted by Georgia to mean only *statutory law*. Case law of the locus (North Carolina) will be consulted only when it is interpretive of such foreign statute. Where there is no applicable foreign statute, the Georgia courts then go through a two-step process. First, in the absence of pleading and proof of "foreign law," the Georgia courts presume that "the common law" is in effect in the foreign state. Second, in determining what this "presumed" common law is, the Georgia courts rather than looking to the foreign case law, look to "the common law" as illumined by Georgia decisions. Thomas v. Clarkson, 1906, 125 Ga. 72, 54 S.E. 77, 6

---

6. As will be developed more fully later, the Defendant's big case, Welcome Wagon, Inc. v. Morris, 4 Cir., 1955, 224 F.2d 693, a well reasoned piece of Erie guesswork on which the Trial Court's decision on the merits was based and which seems to have caused Budget the most difficulty was, in express language, disapproved by the Supreme Court of North Carolina in a strikingly similar case, Welcome Wagon Int'l, Inc. v. Pender, 1961, 255 N.C. 244, 120 S.E.2d 739. The Erie mortality rate is no better in the Fourth than it is in the Fifth Circuit. See United Services Life Ins. Co. v. Delaney, 5 Cir., 1964, 328 F.2d 483, 485 (concurring opinion). On the other hand, the Defendant's Georgia chances are enhanced by the un-cited Thomas v. Coastal Industries Services, Inc., 1959, 214 Ga. 832, 108 S.E.2d 328.

7. Georgia Code Annotated Title 102, § 108 (1933).

8. The Plaintiff argues that while the agreement itself was uncertain as to this, Georgia was the place of performance since both parties were primarily think-ing of an Atlanta franchise. This theory is unsound for several reasons. First, the choice was not narrowed to Atlanta until several days after the agreement was signed. At the time of the signing Indianapolis was also in the picture. Second, and more important, even if it could be said that the parties contemplated only an Atlanta franchise, that intention related to a never-consummated franchise agreement. Whereas, the only agreement signed, the restrictive covenant, was clearly intended by Budget to be enforceable everywhere or almost everywhere. If Fein, before signing the letter, had said, "All right, I'll sign, but let's limit it to Atlanta," it is obvious in light of what Plaintiff elsewhere argues, that this request would have been flatly refused on the ground that the salability of its franchises must be protected everywhere. Third, in light of the foregoing, the covenant language "western hemisphere" is not ambiguous. Its defect is not in meaning. To the contrary, it is all inclusive and therefore too expansive.

L.R.A.,N.S., 658; Akers v. Jefferson County Savings Bank, 1904, 120 Ga. 1066, 48 S.E. 424; Gorman v. Griffin, 1944, 70 Ga.App. 585, 28 S.E.2d 897.[9]

■ As a reflex to this approach, Fein asserts that if a North Carolina statute must be found, then the general anti-monopoly statute will do. North Carolina Code Annotated, § 75.[10] While sections of this statute reflect a public policy in agreement with the many court decisions refusing to enforce certain restrictive covenants, the fact is that none of the North Carolina cases relied upon by Defendant mention any section of the statute. Looking with Georgia eyes through North Carolina eyes, we think the reason is fairly obvious. Refusal of the courts to enforce restrictive covenants of the kind here involved is an outgrowth and continuation of the centuries old hostility to restraints on personal trade, whereas the more recent statutes have arisen aimed at different monopolistic activities. So, as best we can determine, a Georgia court would hold this statute an insufficient basis for applying North Carolina law.[11]

■ In coming to ascertain the applicable Georgia rule, no difficulty is encountered in finding the appropriate general statements. In sum, the Georgia rule—as well as that of North Carolina and most other jurisdictions—is that a restraint on trade in the form of a restrictive covenant will be countenanced when, under all the circumstances, it is a reasonable one. This question, though largely factually oriented, is one for the Court. Rakestraw v. Lanier, 1898, 104 Ga. 188, 30 S.E. 735. This was the test applied by Judge Morgan although he was guided by particular applications of the rule in North Carolina. The dominant considerations of reasonableness have been articulated for Georgia in several cases.

"There are certain well-established tests which control in the determination of whether the limitations are reasonable. 'The court will consider the nature and extent of the trade or business, the situation of the parties, and all the other circumstances'. [citing Rakestraw v. Lanier, supra] To be valid, the covenant in such a contract must be reasonably necessary to protect the interest of the party in whose favor it is imposed, and must not unduly prejudice the interests of the pub-

---

9. The traditional function of conflicts-of-law-rules in contracts is to afford a degree of certainty and symmetry as controversies stray to localities which are strangers. They need not, therefore, necessarily make sense. There are judicial outcroppings in Georgia which reflect some dissatisfaction with a rule that, in this day and time with the plethora of law publications, digests, reports, law reviews, and texts, still "presumes"—without the slightest inquiry which a good Georgia lawyer would make—that the law of another state (here, right next door) in the Union is the same as Georgia. See, e. g., Seaboard Air-line Railway v. Phillips, 117 Ga. 98, 43 S.E.2d 494. To establish the existence of this monster of legal literature, we scarcely need citations. See the Address by Ralph M. Carson at Michigan Law School, "The Prospect of Liberty: Or the View From Saint Remy," published in Frontiers in Law & Legal Education 35 (1961), cited in Brown, Electronic Brains and the Legal Mind: Computing the Data Computer's Collision with the Law, 71 Yale L.J. 239, 251, n. 27 (1961).

10. This prohibits combinations in restraint of trade. Specific emphasis is laid on § 75-5(b) (2) which makes it unlawful for any person directly or indirectly to contract, "(2) To sell any goods * * * upon condition that the purchaser thereof shall not deal in the goods of a competitor or rival in the business of the person making the sales."

11. Although this disposition of the North Carolina statute makes it unnecessary for us to dip into a dispute over whether the Georgia rule that the foreign statute must be pleaded to be relied upon is binding upon a federal court, we do not have any reservations on this score. We are a union of states and the federal courts take judicial knowledge of the laws, statutory and judicial, of all of the states. Neither pleading nor proof is required, 2B Barron & Holtzoff, Federal Practice & Procedure § 963, p. 225 (Wright ed. 1961).

lic. The restrictions imposed upon the promisor must not be larger than are necessary for the protection of the promisee. * * *

"In determining the reasonableness of a restrictive covenant, greater latitude is allowed in those covenants relating to the sale of a business, or dissolution of a partnership, than in those covenants ancillary to an employment contract. This distinction has been expressly recognized by our courts, and seems to accord with the weight of authority from other jurisdictions." Orkin Exterminating Co. of South Georgia v. Dewberry, 1948, 204 Ga. 794, 51 S.E.2d 669, 675.

█ This language is similar to that previously excerpted from Judge Morgan's opinion and indicates that in Georgia as well as North Carolina, the cases have largely fallen into one of two cate-

gories—(a) "sale of business" or (b) "ancillary to an employment contract" with the covenants falling under (a) faring better in the courts than those falling under (b). There is no particular magic to this distinction. It simply reflects that over a long period of time courts have consistently found "sale of business" covenants more acceptable. Of course, not all sale of business covenants have been enforced and not all employee covenants have been struck down.

The distinction is an obvious one.[12]

A covenant not to compete as an adjunct to the sale of a business enables the seller to capitalize on, if not capitalize, and dispose of his good will— thereby receiving a higher price. Often such a covenant may be a material inducement to the purchaser, particularly where he purchases a going concern with the hope of retaining its present customers. Likewise, the net effect of the transfer of a going concern from seller

12. It was cumulatively explained by the Georgia Supreme Court in Dewberry:

"Many reasons have been advanced for the broader latitude given to contracts of sale as distinguished from contracts of employment. In Hood v. Legg, supra [160 Ga. 620, 128 S.E. (891) 895], this court, quoting with approval from 6 R.C.L. 793, § 197, said: 'Public policy requires that every man shall be at liberty to work for himself; and shall not be at liberty to deprive himself or the state of his labor, skill, or talent by any contract that he enters into. On the other hand, public policy requires that when a man has by skill, or by any other means, obtained something which he wants to sell, he should be at liberty to sell it in the most advantageous way in the market; and in order to enable him to sell it advantageously in the market, it is necessary that he should be able to preclude himself from entering into competition with the purchaser. In such a case, the same public policy that enables him to do this does not restrain him from alienating that which he wants to alienate, and therefore enables him to enter into any stipulation which, in the judgment of the court, is not unreasonable, having regard to the subject-matter of the contract. There are several reasons for upholding a covenant on the part of the vendor in all such cases to desist from the business in competition

with the purchaser, which do not obtain in other cases * * * the vendor receives an equivalent for his partial abstention from that business, in the increased price paid him for it on account of his covenant; and his entering into and observance of the covenant not only do not tend to his pauperization to the detriment of the public, but on the contrary, by securing to him the full value of his business and its good will, a value which he has an absolute right to secure in this way, the covenant operates to his affirmative pecuniary benefit and against his impoverishment'. These reasons for upholding a covenant in a contract of sale do not obtain in a contract of employment. On the contrary, restrictive covenants in employment contracts 'tend to injure the parties making them; diminish their means of procuring livelihoods and a competency for their families; tempt improvident persons, for the sake of present gain, to deprive themselves of the power to make future acquisitions, and expose them to imposition and oppression; tend to deprive the public of the services of men in the employments and capacities in which they may be most useful to the community as well as to themselves'. Rakestraw v. Lanier, supra." Orkin Exterminating Co. v. Dewberry, 1948, 204 Ga. 794, 51 S.E.2d 669, 676.

to buyer is to leave the community where it was—with one going concern.

■ But where the covenant restricts an employee's choice of occupation after his current employment is terminated, the considerations are quite different. Such contracts may produce severe hardship on some employees. Also, courts have felt that frequently such a restriction is not necessary to protect the employer. See generally 6A Corbin, Contracts §§ 1384–94 (1962). Only in those cases where an employee, through special skills, being made aware of company secrets, or more important, has had substantial, significant contact with the company's customers, have restraints, reasonable in time and territory, been enforced with any consistency. See, e. g., Orkin Exterminating Co. of So. Georgia v. Mills, 1962, 218 Ga. 340, 127 S.E.2d 796; Asheville Associates, Inc. v. Miller, 1961, 255 N.C. 400, 121 S.E.2d 593; Welcome Wagon Int'l, Inc. v. Pender, 1961, 255 N.C. 244, 120 S.E.2d 739. The businessman's legitimate fear, which the law may here sanction, is that his salesman, local representative, etc. will, after developing customer contacts, go out on his own or with another concern and solicit and steal away his customers.

Judge Morgan's analysis of this covenant was that it should be treated as an "employee" restraint because "although * * * buying and selling a business [was] involved, * * * the instant case is involved with obtaining and using information to the detriment of the originator rather than selling a business and then opening up a like business in competition with the purchaser." He then proceeded to determine the reasonableness of the restriction, fastening primarily on the hemispherical reach of the restraint on Fein.

■ Although both parties as well as the Trial Judge have attempted to put this case in one category or the other, realistically, it does not fit in either, and we decline to believe that Georgia would decide this case by simply slipping it into one or the other. However, it is proper to look to both kinds of cases for the presence or absence in this fact situation of the kind of factors which have been held to tip the balance one way or the other. And having done this, we conclude that this situation is deficient in those factors which have led courts to approve sale of business covenants and—on the other hand—too much infected with some of the characteristics which have sounded the knell for "employee" restrictions.

What did Budget seek to protect by requiring Fein to sign this letter? Presumably, it was its secret operational techniques. When Fein signed the letter, he could have had only the vaguest notion of what he would be shown. He was thus in no position to bargain, but apparently resolved his doubts in favor of being educated.

Of course the equitable doctrine of restrictive covenants is the law's reflex to the needs of the businessman and the commercial world. Consequently it is the business judgment on the value of the relationship, the nature of acquired trade confidences, the uniqueness of skills and the like which counts for much. In that process it is not for Judges, certainly not initially, to determine independent of the practical appraisal of business what is reasonably necessary to protect these several interests. These practical judgments carry great weight. But in the final analysis a court has to evaluate the competing factors to determine whether the legal sanction sought unduly interferes with personal economic freedom of individuals or the flow of goods and services free of monopolistic restraints. Consequently, the court must inescapably consider and weigh these practical factors.

For the covenantee to obtain judicial relief, he must show more than the mere promise of the covenantor. He must bare the soul of the business, or parts of it, even though this breaches for a time or a limited extent the confidences, trade secrets, etc. sought to be protected. And having done so, the court must appraise them as we have briefly done (see

note 3, supra). Before the law will foreclose economic opportunity to an individual for a long period of time because of a covenant exacted as a prelude to the consideration of whether a new relationship is to come into being, it is obvious that what is to be revealed has to be something which is of demonstrable value and deserving of protection.

We can foresee that some pig-in-a-poke business propositions may well have such merit. These could perhaps include investment for development and sale of mechanical or scientific devices prior to, or looking toward, patenting, or under other circumstances in which statutory protection would be inadequate. And there may be others. But, important as is the contemporary use of business franchises—many of which legitimately call for promotional advertising having as its goal, the mailing of the ubiquitous reader's request for more information—there must be extraordinary factors before a promise not to compete merely to get a look-see will be enforced against those only tentatively interested, and then only temporarily. Nothing in this record met that test.

Many factors bear this out. In a sale of business situation, a reasonably drawn covenant will be enforced because it allows the seller to dispose of his good will and the purchaser to buy it. The necessity for a covenant is not so much that the seller has intimate knowledge of a particular line of business, but rather he, as a dominant personality, is so much the life of the business and is known to customers as such, that the buyer would run the very real risk of losing what he had paid for should the seller shortly become his competitor. By protecting this transaction, the covenant facilitates the free transfer of property which is in the public interest. Nothing in Budget's situation approaches this.

There is another important aspect. Budget, by extracting this covenant from everyone it talks turkey with, deleteriously affects a far wider range of people than a covenant ancillary to a sale of business where only two parties—the seller and the buyer—are involved. Of course Budget can say that there are only two parties to this particular agreement. The difference is that when a business changes hands, a transaction economically beneficial to the community occurs, but when an individual signs the Budget agreement, looks the deal over, and then does not buy, the only result of economic significance to the community—here the wide, wide world, or at least the half wide world—is that one less individual is free to choose how he will make his living.

In those "employee" cases which have sustained the validity of covenants restricting free activity after termination of employment, the occupations have in common specialized training and close, if not exclusive, contact with customers, and in each case the employee's leaving forebodes the same quality of danger to the employer as in the sale of a going concern—the very real possibility of a substantial loss of business. See Orkin Exterminating Co. of So. Georgia v. Mills, 1962, 218 Ga. 340, 127 S.E.2d 796; Insurance Center, Inc. v. Hamilton, 1963, 218 Ga. 597, 129 S.E.2d 801. See 6A Corbin, Contracts §§ 1384–1394 (1962).

If Fein had actually bought the franchise and this covenant pertained to the eventuality of his selling out and thereafter competing, it would seem likely that the above cases would apply and a much stronger argument could be made for the enforceability of the covenant. But such is not this case.

What Budget is really doing here is a selling job, a selling job not to go out of business, but to get itself and another in new and more business. It has franchises for sale, and its livelihood depends on selling and maintaining them. And by this covenant it seeks to protect its product vis-a-vis its prospects who are unusual prospects in that they may become competitors—or so Budget fears. In this respect its prospective customers are not like the buyers of soap, TV's, or hairspray. But in this "world of advertising," Randy Knitwear, Inc. v. American Cyanamid, Inc., 1962, 11 N.Y.2d 5,

226 N.Y.S. 363, 181 N.E.2d 399; Ford Motor Co. v. Mathis, 5 Cir., 1963, 322 F.2d 267, 273; Travelers Indemnity Co. v. Holman, 5 Cir., 1964, 330 F.2d 142, 145, they are not too different. Budget as a purveyor of a competitive product in a market economy cannot escape the risk that its promotional advertising will result in someone being educated to the need or the desire for the product in a general way, but deciding particularly that what he wants is the competitor's product. If this covenant is given effect, this choice may be effectively foreclosed to anyone who wants to consider carefully a Budget franchise. Obviously this has an anti-competitive effect since anyone talking to Budget is nailed down for two years—anywhere in the western hemisphere. Business necessities justifying such a consequence are not revealed in this record.

Another basis—independent of those already mentioned—why this covenant cannot be enforced is that the territory encompassed is unreasonably large. The case of Hood v. Legg, 1925, 160 Ga. 620, 128 S.E. 891, relied upon by the Plaintiff, involved the sale of a brick company and a covenant not to compete within a 300-mile area. Bricks were not sold throughout this area but the buyer anticipated such expansion, and the Court after distinguishing this from the "employee" cases, held the limitation reasonable. The Court, however, was careful to disapprove limitations so broad as to extend throughout the United States. Obviously though, reasonableness of the territorial restraint "depends not so much on the geographic size of the territory as on the reasonableness of the territorial restriction in view of the facts and circumstances of the case." Rakestraw v. Lanier, 1898, 104 Ga. 188, 30 S.E. 735. In Orkin Exterminating Co. v. Dewberry, 1948, 204 Ga. 794, 51 S.E.

2d 669, where the situation of the individuals involved is more similar to that of Fein, the Supreme Court of Georgia refused to uphold a limitation extending nearly throughout the state and encompassing some areas where no business was done, but where the company, in the Court's words, "hopes and anticipates it will conduct business in the future," but "the anticipation is nothing more than a hope, based upon contingencies, which may or may not occur." 51 S.E.2d at 677. Although the territorial limit in that contract was drawn in terms of specified counties, the Court would not give the covenant selective limited enforcement. Recently, in Thomas v. Coastal Industrial Services, Inc., 1959, 214 Ga. 832, 108 S.E.2d 328, it was clearly decided that where the limitation against future employment describes an area greater than that in which the employer is then doing business and in which there is a substantial basis for the expectation of expansion in the reasonably foreseeable future, there can be no limited enforcement and the covenant is void in its entirety.[13] This means that Hill v. Central West Public Service Co., 5 Cir., 1930, 37 F.2d 451, in which the 5th Circuit in a pre-Erie opinion, allowed limited enforcement in a sale of business case in the Texas city where the business was located, has no vitality for this Georgia-North Carolina-western hemisphere case. Since Budget does not do business throughout the western hemisphere and the papers utterly fail to demonstrate that there is any reasonably foreseeable likelihood that it will in the near future, it follows that the territorial limitation is unreasonably broad. The covenant is therefore unenforceable.

Although most of the cases discussed have arisen on suits for injunctions and it is possible that the courts would be more inclined to give relief in a suit for

---

13. In North Carolina a different result was reached in Welcome Wagon Int'l, Inc. v. Pender, 1961, 255 N.C. 244, 120 S.E.2d 739, but there the language and structure of the covenant in successively larger and larger prohibited areas was easily divisible, and the Court was able to enforce the covenant in the contractually described locality where the damage was done. In this case, were North Carolina law applied, the language does not permit of such division—and Budget clearly intended to make it enforceable everywhere.

damages, Welcome Wagon, Inc. v. Morris, 4 Cir., 1955, 224 F.2d 693, 701 (North Carolina case, now largely defunct), in this case it makes no difference. In the first place, there is nothing in the Georgia cases to indicate that a different result would be reached. Secondly, in this case the amount and nature of the liquidated damages would, and are intended to be, just as oppressive on Fein as an outright bar from the business either for the two years or the seven or eight remaining months under the two-year restriction. In the one case it is the restraint of an equity decree, in the other, the bonds of a heavy financial forfeit.[14]

Affirmed.

---

14. Although damages are not involved as such, item [4] of the covenant, note 2, supra, provides "as liquidated damages" a sliding scale of $17.50 per 1,000 population of each of the cities where he carries on a discount car rental, plus $5.00 per month per vehicle rented. In metropolitan areas it is readily conceivable that the payments due would bear no relation to competitive effect and would amount to a penalty, nothing less.