MOULDINGS, INC., Plaintiff,

v.

**Ernest E. POTTER, Wallace Summers, Floyd Martin, and Blue Line Corporation, Defendants.**

**Civ. A. No. 712.**

United States District Court,
M. D. Georgia,
Americus Division.

July 13, 1970.

Frank C. Jones, Jones, Cork, Miller & Benton, Macon, Ga., and Kenneth W. Hergenhan, King, Miller, Anderson,

Nash & Yerke, Portland, Or., for plaintiff.

Peter Zack Geer, Smith, Gardner, Wiggins, Geer & Brimberry, Albany, Ga., and J. Frank Myers, Americus, Ga., for defendants.

## OPINION

ELLIOTT, District Judge.

Mouldings, Inc. ("Mouldings" or "plaintiff") filed this civil action against Ernest E. Potter ("Potter"), Wallace Summers ("Summers"), Floyd Martin ("Martin"), and Blue Line Corporation. Jurisdiction is based upon diversity of citizenship, Mouldings being an Oregon corporation having its principal office at Marion, Virginia, the three individual defendants all being residents of Sumter County, Georgia and the defendant Blue Line Corporation being a Georgia corporation having its principal office in Sumter County. Potter, Summers and Martin are former employees of Mouldings, and Potter and Summers are now the sole stockholders, directors and officers of Blue Line Corporation.

The action was filed in two counts but only Count One is here involved.[1] In Count One, Mouldings prays that Potter, Summers and Martin be enjoined from violating non-competition covenants contained in employment agreements separately entered into between them and Mouldings while in its employ, and that injunctive relief also be granted with respect to Blue Line Corporation since it was organized and is owned and controlled by Potter and Summers.

The case came on for a hearing before the Court, after due notice to the defendants, on the prayer of Mouldings for an interlocutory injunction. Extensive oral and documentary evidence was introduced by plaintiff and defendants. At the conclusion of the hearing, it was stipulated by counsel for all parties that the record was complete

1. In Count Two, which is against Potter alone, plaintiff seeks to recover profits allegedly realized by Potter from the purchase and sale of securities of Mouldings, Inc. within a period of less than six months, pursuant to Section 16(b) of the Securities Exchange Act of 1934.

with respect to the injunctive relief sought in Count One and that the Court could on the basis of this record enter a final ruling with respect to the prayer for a permanent injunction. Oral argument was presented at the hearing and written briefs were also filed by counsel.

It is the judgment of the Court that a permanent injunction should be granted against all defendants, as prayed for by the plaintiff, based upon the findings of fact and conclusions of law set forth hereafter in this opinion.

## FINDINGS OF FACT

*Nature of Plaintiff's Business*

Plaintiff is engaged in the processing and sale throughout the United States of wood moulding which it purchases from others, being a primary supplier of prefinished moulding to the mobile home manufacturing and building industries.[2]

The processing of wood moulding involves sanding the raw wood moulding, coating the moulding with a specially formulated paint basecoat, drying the basecoat in controlled heat ovens, printing a wood grain pattern on moulding that is to have a natural grain appearance, topcoating with clear protective finishes, and packaging the finished product. This wood moulding with its factory-applied finish is popularly called "prefinished moulding".

Most of the prefinished moulding produced by plaintiff is wood grain printed to match or complement the grain and finish of most prefinished plywood paneling produced by the major plywood manufacturers. In order to match or complement the myriad grains and finishes of prefinished paneling, plaintiff has on file hundreds of special basecoat formulations, many different wood grain patterns, and a variety of printing ink colors. The possible combinations of these three variables is almost infinite. The remainder of the prefinished mould-

ing produced by plaintiff is factory finished in solid color or novelty print design to match and complement painted or other surfaces.

James T. Rash, who is now the President and major stockholder of Mouldings, began this business as a proprietorship in 1960. Mouldings, Inc. was incorporated in Oregon in 1964 and the company has grown rapidly since then. It now has manufacturing plants in Harrisburg, Oregon and Marion, Virginia, and fourteen distribution centers scattered throughout the United States plus a center at Calgary, Alberta. Four of plaintiff's warehouses are located in the southeastern area, to-wit, at Americus, Georgia, Haleyville, Alabama, Charlotte, North Carolina, and Ocala, Florida.

Plaintiff's sales for the year ended April 30, 1970 were approximately $34,000,000.00. It was estimated that about one-third of the total were consumer sales and about two-thirds industrial sales. Industrial sales are handled through the distribution centers referred to above and the great majority of customers sold through these centers are mobile home and travel trailer manufacturers.

Plaintiff's officers testified at the hearing that they believe that plaintiff's sales constitute approximately 50% of the total sales volume in the prefinished wood moulding field at present. However, there are at least ten or fifteen other companies actively engaged in the field and the competition has become increasingly vigorous, as demonstrated by the fact that plaintiff's market penetration, i. e. its percentage of total sales, has decreased in recent years.

*Potter's Relationship with Plaintiff*

Plaintiff's relationship with the defendant Potter began early in 1966. Potter was then engaged in other work and had no experience in the prefinished moulding field. Plaintiff had a number

---

2. While Potter, Summers and Martin were employed by it, approximately 98% of plaintiff's sales were of prefinished wood moulding; and their activities were for practical purposes confined exclusively to the marketing of this one product.

of active accounts in Georgia and other southeastern states that were being supplied from the Harrisburg, Oregon plant and it was felt that a distribution center should be established in Georgia to render better service to these customers. Potter accepted an offer of James T. Rash, plaintiff's President, to move to Americus, Georgia and open a warehouse there. A Georgia corporation known as Southern Mouldings, Inc. was formed by Rash, Potter, and Donald D. Jensen (plaintiff's general sales manager), their respective percentages of ownership being 45%, 45% and 10%. All accounts of plaintiff's existing customers in the southeastern area were turned over to Southern Mouldings, Inc. and were thereafter serviced by it. Southern Mouldings, Inc. was largely financed by plaintiff and as a practical matter was operated as a corporate subsidiary.

Southern Mouldings, Inc. grew rapidly in proportion to a tremendous build-up in the mobile home manufacturing business in the southeast. Additional distribution centers were established in Haleyville, Alabama, Ocala, Florida and Charlotte, North Carolina and the managers of these warehouses were employed by Potter and were responsible directly to him. Potter established a close personal relationship with plaintiff's customers throughout the territory served by Southern Mouldings, Inc., including primarily the states of Georgia, Alabama, Florida, North Carolina and South Carolina.

During the latter part of 1968, there was serious discussion regarding a possible public offering of stock by Mouldings, Inc. As a preparatory step, plaintiff acquired a direct controlling interest in Southern Mouldings, Inc. in August, 1968 by exchanging its stock for the Southern Mouldings, Inc. stock held by Rash and Jensen. Potter declined to exchange his stock at that time but thereafter, on November 30, 1968, he entered into a written agreement calling for an exchange on exactly the same basis. This was consummated early in December. Potter received 7,686 shares of plaintiff's stock in exchange for the stock owned by him in Southern Mouldings, Inc. and Texas Mouldings, Inc. (a similar corporation established in February, 1968 with Rash, Potter and two other company officials being the stockholders). The exchange was an extremely profitable one from Potter's standpoint. His cost basis in the Southern Mouldings, Inc. and Texas Mouldings, Inc. stock totalled only $20,000.00. The 7,686 shares of plaintiff's stock that he received had a book value on the date of the exchange of $142,191.00. There was a public offering in January, 1969 at a price of $29.50 per share and subsequently the stock was split four for one (by two two for one splits). At one time in 1969, the Mouldings, Inc. stock acquired by Potter in the exchange (which is traded on the American Stock Exchange) had a value of about $900,-000.00, and even in the depressed market existing at the time of the hearing the value was approximately $220,000.00.[3]

On December 12, 1968, within a few days after the consummation of the stock exchange agreement, a written employment agreement was entered into among Mouldings, Inc., Southern Mouldings, Inc. and Potter, and simultaneously Potter was granted an option to purchase 2,000 shares of Mouldings, Inc. stock on

---

3. The exchange agreements provided that Potter would not sell, transfer, pledge, hypothecate or otherwise dispose of any of the shares of Mouldings, Inc. stock acquired by him unless such shares were registered under The Securities Act of 1933, which has not occurred. Despite this prohibition, Potter acknowledged at the hearing that he pledged all of the shares received by him in the exchange with a bank at Marion, Virginia as security for a $200,000.00 loan. He used the loan proceeds to purchase shares of stock of a company known as Triangle Mobile Home Products, and then used the Triangle stock as security for a loan from a bank at Americus, Georgia in the amount of $90,000.00, and the proceeds of this loan were subsequently used to form and finance Blue Line Corporation to go into competition with plaintiff.

the terms and conditions set forth in a written stock option agreement. It is inferable from the evidence that the employment agreement and the stock option were essential parts of an overall understanding that had been reached between plaintiff and Potter in connection with the acquisition by plaintiff of Potter's stock in Southern Mouldings, Inc. and that the non-competition covenant, which is referred to hereafter, was not only ancillary to Potter's continued employment but was also directly associated with the sale by Potter of his 45% stock interest in plaintiff's subsidiary.

The employment agreement contained detailed recitals to the effect that the production and distribution of plaintiff's products, and its contacts and relationships with customers, were confidential and involved secret techniques and processes. In consideration of his continued employment for a definite term at an increased salary and of the receipt of the stock option, Potter agreed to certain covenants, among them being a covenant not to compete with plaintiff within a two year period following termination of his employment for any reason. This covenant is in paragraph 2(e) of the employment agreement and reads as follows:

"2. *Performance.* Employee

\* \* \* \* \* \*

"(e) For a period of two years immediately following termination of employment, voluntary or involuntary, agrees not to, directly or indirectly, by himself or in conjunction with any person, firm or corporation, call upon any customer of Company or Parent or compete with Company or Parent or otherwise engage in the business of Company or Parent by performing any of the activities which he performed while in the employ of Company within the territory in which he actively worked or within the geographic area of his responsibilities performed while in the employ of Company for his own benefit or for the benefit of any other person, firm or corporation, nor shall he engage in any activity for the purpose of (1) soliciting or selling to such customer any product or products competing with those produced by Parent or (2) diverting or taking away any customer of Company or Parent." [4]

It is clear that Potter realized the significance of the non-competition provision quoted above at the time he executed the agreement. This was demonstrated by his testimony that he deliberately signed the agreement on the wrong line at first, signing in behalf of Southern Mouldings, Inc. rather than individually as the employee, and when this was brought to his attention later that same day his reaction was, "Oops, I'm caught", whereupon he then signed on the correct line for the employee. Potter accepted all benefits provided by the employment agreement, including an increase in his salary from $1,500.00 to $2,000.00 a month and the stock option referred to above, and he did not question the validity of the contract prior to his resignation.

For a brief period after the employment agreement was signed, Potter continued as general manager of Southern Mouldings, Inc. at Americus, Georgia, continuing to have responsibility for all sales in the southeastern states. He was transferred early in 1969 to plaintiff's plant at Harrisburg, Oregon where he spent approximately a month being thoroughly indoctrinated with respect to the production and national distribution of plaintiff's products.[5] In May, 1969, he

---

4. Southern Mouldings, Inc., referred to as "Company" in the agreement, was dissolved by plaintiff in the fall of 1969. Plaintiff is referred to in the agreement as "Parent".

5. Although Potter professed a lack of technical knowledge regarding plaintiff's production methods and techniques at the hearing, the evidence revealed that he graduated from the U. S. Naval Academy, where he received some training in engineering, and then obtained a masters degree in mechanical engineering from MIT. (He also earned an MBA degree in finance and accounting at Columbia University.)

was elected as Vice President, Industrial Sales, and transferred to plaintiff's manufacturing plant at Marion, Virginia, where he assumed primary responsibility for industrial sales throughout the United States. He had direct supervision over all warehouse sales, including those in the southeastern states. All warehouse managers reported directly to him and he personally visited these warehouses and assisted the managers in customer relationships and all other needed respects. He also had direct responsibility for handling plaintiff's national accounts with the largest mobile home manufacturers, dealing personally with key corporate officials of these firms and becoming well acquainted with many of them (more so than any other official of plaintiff).

Potter's responsibilities were broadened in July, 1969 when he was elected Vice President, Marketing Services. At the same time he was elected as a Director of plaintiff (one of only seven members); as such, he became intimately familiar with and participated in all policy decisions of the company relating to short and long range planning, prospective acquisitions, new products, financial details, manufacturing strategy, and so on. It is interesting to observe that one of the matters discussed by the Board of Directors during this period was the future establishment of a manufacturing facility in Americus alongside plaintiff's warehouse there. Potter had complete access to all records and information of every kind.

Potter orally resigned from his employment on January 29, 1970, effective as of February 1, 1970. He stated that he disagreed with a proposed reorganization of plaintiff's sales effort under which he would hold the title of "Assistant General Sales Manager". Potter would have retained substantially the same responsibilities, however, and would have continued as Vice President and Director without any loss of benefits of any kind.

*Summers' Relationship with Plaintiff*

Wallace Summers sold mobile home products for a number of years before going to work for plaintiff but had had no experience in connection with the marketing of prefinished moulding. He was employed by plaintiff on Potter's recommendation for the purpose of succeeding Potter as general manager of the southeastern area. He signed an employment agreement dated December 12, 1968 (although this was evidently executed at a somewhat later date) that was virtually identical to the one executed by Potter, including the non-competition provision contained in paragraph 2(e) quoted above, and he also received a stock option. The execution of the employment agreement and stock option by Summers were attended to in behalf of plaintiff by Potter.[6]

Summers became plaintiff's general manager for the southeastern area. He was fully responsible for warehouse sales at Americus, Georgia, Haleyville, Alabama, Ocala, Florida and Charlotte, North Carolina and for the servicing of all customers of plaintiff in the southeastern area. He had complete access to and supervisory responsibility for all records at the warehouses in this geographical area, including customer lists, credit records, and the like. Just as had Potter before him, Summers established a personal relationship with many customers of plaintiff in the southeast. He continued to exercise all of these responsibilities until he resigned as of March 1, 1970.[7]

He was in this plant and later in the Marion, Virginia plant on many occasions and had ample opportunity to familiarize himself with all phases of the production process.

6. The employment agreement provided that Summers would be employed for a term of three years commencing January 13,

1968; Potter explained at the hearing that this should have been January 13, 1969 and that he had inadvertently inserted the wrong year.

7. When Potter orally resigned on January 29, 1970, he suggested, in response to an inquiry by Rash, that Summers be promoted to "Assistant General Sales Man-

*Martin's Relationship with Plaintiff*

The third individual defendant, Floyd Martin, also had had no experience whatever in the prefinished moulding field before being employed by plaintiff, again on Potter's recommendation, in March of 1969. He executed an employment agreement on April 26, 1969 substantially the same as the ones signed by Potter and Summers, the principal difference being that Southern Mouldings, Inc. was not a party to the agreement, and he also received a stock option. Martin was initially sent to Harrisburg, Oregon, where he was given a complete indoctrination into the production and marketing of the company's products. He became Plant Sales Manager both for consumer and industrial sales and functioned in this capacity until February 1, 1970. On or about that date he was offered the position of "Assistant General Sales Manager" (the position Potter and Summers had both refused) and he accepted this promotion at least tentatively and was transferred to the Marion, Virginia plant. From early in February, 1970 until he resigned on March 10,[8] effective as of March 15, he shared direct responsibility (as Jensen's assistant) for industrial sales from warehouses throughout the United States, including the four warehouses in the southeastern states. Among other things, he personally visited these warehouses at Americus, Haleyville, Ocala and Charlotte and assisted in the setting up of new accounting procedures. Although he held this position only about 4½ weeks, Martin had complete access during that period to all of plaintiff's confidential information regarding its customers and the marketing of its products in the southeastern states and the warehouse managers were subject to his supervision and control.

Like Potter, neither Summers nor Martin questioned the validity of the non-competition covenants in their employment agreements prior to their resignations and they accepted all benefits provided by the agreements.

*Competitive Activities and Effects Thereof*

Almost immediately after leaving plaintiff's employ on February 1, 1970, Potter began making plans to go into competition with plaintiff. He admitted that this "possibility" had occurred to him even before he resigned, which would seem to be consistent with the rapidity with which he was able to organize the new business venture.

Although Summers continued as a full-time employee of plaintiff and on plaintiff's payroll until March 1, 1970, the evidence revealed that during February he began actively to assist Potter in the competitive endeavor, including conferring with metal building manufacturers and obtaining specifications for a building suitable for manufacture and distribution of prefinished moulding. The name "Blue Line Corporation" appears on correspondence bearing February dates produced at the hearing by defendants in response to plaintiff's subpoenas duces tecum and it was shown that a post office box at Americus was obtained in that name in February.

Early in March, Potter and Summers obtained Articles of Incorporation for Blue Line Corporation as a Georgia corporation with its principal office in Sumter County. The primary business purpose of this corporation was the manu-

---

ager", the position that Potter had refused. A meeting was arranged that evening among Rash, Summers, and Donald D. Jensen, at which time Summers was offered this post. He received a telephone call during the course of the discussion from Potter, who had somehow ascertained where the meeting was taking place, and in view of the fact that Summers declined the offer within a few

days and shortly thereafter submitted his resignation, there is reason to believe that Potter may have encouraged him not to accept the promotion in this conversation.

8. Martin testified that he called Potter on March 8 or 9, that Potter offered him a job with the new company he and Summers were forming, and that he then submitted his resignation on March 10.

facture and distribution of prefinished moulding. Potter and Summers are the only stockholders, owning 800,000 and 100,000 shares, respectively, and they are also the only directors and officers. Martin joined them about March 20 and was given the title of Administration and Operations Manager.

Acting in the name of Blue Line Corporation, Potter and Summers, and later Martin, began to get in touch with a large number of mobile home manufacturers, including many who were existing customers of plaintiff in the southeastern area. They actively solicited the business of these customers and sought to divert them away from plaintiff. Summers and Potter, in particular, have sought to take advantage of personal relationships with customers that had been established by them while employed by Mouldings, Inc. and Southern Mouldings, Inc.

In the preparation of a specifications manual for Blue Line Corporation's prospective suppliers, Martin copied almost verbatim the text and many of the profiles in plaintiff's specification manual. Martin corresponded with suppliers of raw wood moulding who were known by the individual defendants to be existing suppliers of plaintiff and sought quotations based upon specifications in the manual largely copied from plaintiff's.

Potter and Summers have contacted a number of plaintiff's employees and have succeeded in hiring several of them to work for Blue Line Corporation, including plaintiff's warehouse manager in Americus and one of plaintiff's production superintendents at the Marion, Virginia plant. Other warehouse managers, such as the one at Ocala, Florida, were also approached unsuccessfully, and a position was even offered to plaintiff's general sales manager, Jensen.

Although Blue Line Corporation is already engaging in the distribution of products other than prefinished moulding that will be unaffected by the Court's injunction, as pointed out hereafter, and the defendants hope to add additional lines, clearly, the principal purpose of this corporation from the outset has been to engage in direct competition with plaintiff in the southeastern area consisting of Georgia, Alabama, Florida, North Carolina and South Carolina, by selling prefinished moulding to mobile home manufacturers having plants in this geographical area. All of the activities of Potter, Summers and Martin, whether pertaining to production or marketing, or administration of the corporation's affairs, are directed toward this ultimate end. The activities of the individual defendants in behalf of Blue Line Corporation have thus been identical to the activities which they performed while in the employ of plaintiff.

Plaintiff's attorneys wrote Potter on April 8, and Summers and Martin on April 10, 1970, cited the non-competition provision in the employment agreements, called upon them to cease violating these covenants, and put them on notice that plaintiff would take legal action to enforce the covenants if necessary. The defendants ignored these communications and continued with their plans. All three defendants admitted at the hearing that they have been and are knowingly violating the non-competition covenant and they offered no justification other than their contention of its non-validity.

Irreparable harm and injury will be suffered by plaintiff unless injunctive relief is granted as prayed for. As pointed out above, the defendants are now taking advantage of personal relationships with customers established by them while in plaintiff's employ and are engaged in an active and vigorous campaign to divert these customers from plaintiff. In a letter to a supplier written in April, Potter forecast that sales of prefinished moulding by Blue Line Corporation would total $1,290,000.00 during the initial six month period from July to December, 1970 that the company hoped to be in operation, and the projected sales for December, 1970 indicate that he anticipated annual sales in 1971 that would approach $4,-000,000.00. The great bulk of the prospective sales would presumably be to existing or former customers of plaintiff.

There was substantial testimony at the hearing, both oral and documentary, showing that plaintiff has developed processes, techniques, machinery, and customer and supplier relationships of a confidential nature, some of which are trade secrets, at great expense and effort, that have permitted plaintiff to acquire a limited competitive advantage over other companies engaged in the same business. The individual defendants, none of whom were experienced in the prefinished moulding business before going to work for plaintiff, had access to this confidential information and the record demonstrates that they are in a position effectively to utilize such confidential information and trade secrets in the organization and operation of the defendant Blue Line Corporation and will do so to plaintiff's harm and injury unless enjoined. Blue Line Corporation would derive very substantial benefit from the use by Potter, Summers and Martin of the expertise and confidential information developed and acquired by them while employees of plaintiff. Costly mistakes and delays could be held to a minimum, for example, through the use and application of plaintiff's proven techniques and processes. Rather than the newly formed company having to engage in a prolonged and expensive period of trial and error-type development, it could almost overnight become an effective competitor of plaintiff—and it appears that it could do so this quickly only in this manner—by immediately taking advantage of the confidential information and knowledge they acquired as employees of plaintiff.

■ There is intense competition in the southeastern area at the present time, with seven prefinished moulding manufacturers, including plaintiff, selling their products on an active basis in the State of Georgia, for example. Competition is vigorous both in the pricing of products and in the rendition of service. The granting of injunctive relief in this instance will not result in any special injury to the public interest.

It was brought out at the hearing that the retail value of all prefinished moulding in a typical mobile home selling for $6,000.00 to $10,000.00 is only $55.00. The activities of Potter, Summers and Martin while plaintiff's employees related solely to the sale of prefinished moulding and the injunctive relief sought by plaintiff would apply only to that one component part of a mobile home. The individual defendants and Blue Line Corporation are thus free to manufacture and distribute any of the hundreds of other items that go into a mobile home, including all of the items that Summers sold before going to work for plaintiff. Blue Line Corporation is already engaged in the sale of a number of these other items, as above stated.

## CONCLUSIONS OF LAW

■ Since the Court's jurisdiction is based upon diversity of citizenship, state law controls with respect to the interpretation and enforcement of the employment agreements. The agreements with Potter and Summers provide that they are to be governed by Georgia law and the agreement signed by Martin states that it is to be governed by Oregon law. The applicable law of these two states is discussed hereafter.

### Georgia Law

■ "Under Georgia law, covenants not to compete are upheld if they are limited as to time and territory and definite as to the nature, kind and character of the activities prohibited. Bennett v. Georgia Industrial Catering Company, 1966, 222 Ga. 127, 149 S.E.2d 81; Shirk v. Loftis Brothers, 1918, 148 Ga. 500, 97 S.E. 66; Rakestraw v. Lanier, 1898, 104 Ga. 188, 30 S.E. 735." Water Services, Inc. v. Tesco Chemicals, Inc., 410 F.2d 163 (5 Cir. 1969).

In Rakestraw v. Lanier, supra, an often cited Georgia decision in this field of law, the Supreme Court of Georgia defined the test for determining the reasonableness of the restraints on

activities in these words (104 Ga. at p. 195, 30 S.E. at p. 738):

" * * * if, considered with reference to the *situation, business,* and objects of the parties, and in light of all the surrounding circumstances with reference to which the contract was made, the restraint contracted for appears to have been for a just and honest purpose, for the protection of the legitimate interests of the party in whose favor it is imposed, reasonable as between them, and not specially injurious to the public, the restraint will be held valid. * * * "

In Shirk v. Loftis Brothers, supra, the law is summarized as follows:

"1. An agreement in restraint of trade, ancillary to a contract of employment, supported by a valuable consideration, and limited as to both time and territory, and not otherwise unreasonable, is enforceable."

There have been literally dozens of Georgia decisions involving non-competition agreements, many of which are annotated in Georgia Digest, Contracts, ☞117. No good purpose would be served by an exhaustive review of these decisions since it is clear in the final analysis that each case has been decided largely upon the basis of the particular facts there involved. Suffice it to say that the test of reasonableness set forth in Rakestraw v. Lanier, supra, has generally been followed and this is particularly evident in the most recent decisions of the Supreme Court of Georgia in this area.

The Court concludes from a review of the Georgia law that the non-competition covenants contained in the agreements signed by Potter and Summers are valid and enforceable.

First, it is clear that the agreement in each instance was supported by a valuable consideration, namely the promise of the employer to employ or to continue to employ the employee for a definite term and at a specified salary (an increase in salary in Potter's case and a beginning salary for Summers) plus the granting of a stock option to each. It has been held that a mere agreement to *continue* to employ an employee furnishes a sufficient consideration for a non-competition covenant under Georgia law. See Thomas v. Coastal Industrial Services, Inc., 214 Ga. 832, 108 S.E.2d 328 (1959) and cases cited therein.

Second, the covenant in each instance was reasonably limited as to time, to-wit, two years following the termination of employment. Longer periods of time have been recognized as reasonable by the Supreme Court of Georgia—e. g. three years in Breed v. National Credit Association, Inc., 211 Ga. 629, 88 S.E.2d 15 (1955)—and a two year time period has been referred to as being "unquestionably reasonable". Turner et al. v. Robinson et al., 214 Ga. 729, 730, 107 S.E.2d 648 (1959).

The defendants have contended in this case that the covenants are not reasonably limited as to territory and are also "otherwise unreasonable". Neither contention is meritorious.

With respect to the territorial limitation, the covenant provides that neither Potter nor Summers shall compete with plaintiff, "within the territory in which he actively worked or within the geographic area of his responsibilities * * * "

In Turner v. Robinson, supra, the Supreme Court of Georgia unanimously upheld a covenant containing similar language. There the restrictive covenant read in full:

"As part of the consideration of this agreement, employee agrees that for two (2) years following the termination of his employment with Employer regardless of how such termination is brought about, he will not engage in the business of boring, digging or drilling horizontal holes or tunnels in the earth, either as a principal, partner, employee, stockholder, or otherwise, *within any territory assigned to him at any time during his employment by Employer,* within two years next preceding such

termination, \* \* \*." (Emphasis supplied.)

The territory assigned to the employee was the "Dixie Division" consisting of the states of Georgia, Florida, Alabama, South Carolina and North Carolina, the contract providing that this territory could be changed at any time by the employer. The Supreme Court of Georgia held that an interlocutory injunction should have been granted against the employee because the covenant was a reasonable one under the facts and circumstances of that case.

See also Water Services, Inc. v. Tesco Chemicals, Inc., supra; the covenant upheld in that case prohibited competition for a period of two years, "in any territory in which he (the employee) has performed services under this contract."

As stated by the Fifth Circuit Court of Appeals in another decision applying Georgia law:

" \* \* \* Obviously though, (the) reasonableness of the territorial restraint 'depends not so much on the geographic size of the territory as on the reasonableness of the territorial restriction in view of the facts and circumstances of the case'. Rakestraw v. Lanier, 104 Ga. 188, 30 S.E. 735 (1898). \* \* \* "

Budget Rent-A-Car Corporation of America v. Fein, 342 F.2d 509, 518 (5 Cir. 1965).

The Court must determine from the facts and circumstances of the present case what constitutes a reasonable territorial limitation under the covenant, that is to say, determine and declare the territory within which Potter and Summers each actively worked and the geographic areas to which their responsibilities extended while they were em-

ployed by plaintiff. With respect to Summers, it is clear that during virtually the entire period of his employment he was General Manager of the southeastern area comprised of Georgia, Florida, Alabama, North Carolina and South Carolina, that he had direct supervisory responsibility for this entire geographic area and that he regularly performed activities in behalf of plaintiff throughout this area. This is the same geographic area recognized as reasonable in Turner v. Robinson and is a reasonable territory for application of the covenant under the facts and circumstances here.

■ Potter preceded Summers as General Manager of the southeastern area and had the same responsibilities and performed the same activities in that capacity. When he was promoted to Vice President and later elected as a Director he assumed responsibility for all warehouse sales throughout the United States including the four warehouses in the southeastern area and Summers reported directly to him. It would be reasonable as a minimum for the same five state area to apply with respect to him. Indeed, Georgia law apparently would support a far broader territorial limitation as to Potter in view of the actual nature of his activities and responsibilities but it is unnecessary to decide that question in the present case since the evidence indicated that Blue Line Corporation intends for the foreseeable future (which would presumably include a period of at least two years from the dates of the defendants' resignations) to engage in competition with plaintiff primarily, if not exclusively, in the southeastern area and Potter's violation of the covenant is solely in his capacity as a stockholder, director and officer of that corporate defendant.[9]

---

9. It should also be noted that the employment agreement signed by Potter was incidental to the acquisition by plaintiff of his stock interest in Southern Mouldings, Inc. and Texas Mouldings, Inc. Greater latitude is allowed with respect to restrictive covenants incident to the sale of a business interest. Orkin Exterminating Co.,

Inc. v. Dewberry, 204 Ga. 794, 803, 51 S. E.2d 669 (1949). It has been repeatedly held that the restraint may extend to all the territory covered by the business the good will of which has been sold. See, e. g., Kutash v. Gluckman, 193 Ga. 805, 808, 20 S.E.2d 128 (1942), and Legg et al. v. Hood, 154 Ga. 28, 113 S.E. 642

The defendants' contentions that the covenant is "otherwise unreasonable" are based upon such decisions of the Supreme Court of Georgia as Dixie Bearings, Inc. v. Walker, 219 Ga. 353, 133 S.E.2d 338 (1963) and Stein Steel & Supply Co. v. Tucker, 219 Ga. 844, 136 S.E.2d 355 (1964). In these cases the Court reasoned that the agreement in question was indefinite and vague as to the nature, kind and character of activity the employee should not engage in and that the prohibition in each instance was so absolute that the employee could not work *in any capacity* (even as a truck driver or night watchman) for a competitor.

However, *Stein Steel & Supply Co.* was a four-three decision of the Supreme Court of Georgia and the *Dixie Bearings* case was not a unanimous decision (there being a special concurrence) and, under the "full-bench rule" of the Supreme Court of Georgia, neither decision is binding upon that Court. See, in this connection, the dissenting opinion of Associate Justice Mobley in Stein Steel & Supply Co., *supra*, 219 Ga. at p. 847, 136 S.E.2d 355, and also Water Services, Inc. v. Tesco Chemicals, Inc., *supra*, 410 F. 2d at pp. 168–169.

Furthermore, the reasoning of these cases has been rejected in a recent full-bench decision of the Supreme Court of Georgia, Baxley v. Black, 224 Ga. 456, 162 S.E.2d 389 (1968), where, as pointed out in the *Water Services, Inc.* decision, the Supreme Court of Georgia, speaking through Justice Mobley, "returned to the broad test of reasonableness laid in *Rakestraw*". 410 F.2d at p. 169. See also Bennett v. Georgia Industrial Catering Co., 222 Ga. 127, 149 S.E.2d 81 (1966).

Even under the view enunciated in the *Dixie Bearings* and *Stein Steel & Supply Co.* decisions, the covenant in question would not be "otherwise unreasonable". The covenant is not vague and indefinite as to the prohibited activities. Summers and Potter each agreed not to compete with plaintiff "by performing any of the activities performed while in the employ of company", including specifically selling competing products to plaintiff's customers and diverting or taking away these customers. During all of the time that they were employed by plaintiff, Potter and Summers were concerned only with the marketing of prefinished moulding to plaintiff's customers. It is precisely those activities that are prohibited under the covenant in this case. They are not prohibited from engaging in activities they did not perform while employed by plaintiff or from manufacturing and distributing products other than prefinished moulding.

Finally, the Court concludes that the covenant was reasonably necessary to protect the legitimate business interests of plaintiff and that its enforcement will not be specially injurious to the public. In this connection as well as on the other questions considered above, particular attention is directed to the decision of the Fifth Circuit Court of Appeals in Water Services, Inc. v. Tesco Chemicals, Inc., *supra*, decided in 1969. There was substantial and persuasive evidence in the present case, both oral and documentary, just as in the Water Services case, establishing that over a period of time and at great effort and expense the plaintiff has developed processes, machinery, customer and supplier relationships, and other things of a confidential nature that have given it a limited competitive advantage in its field. Plaintiff had a legitimate interest in seeking to protect its trade secrets and other confidential information by means of a restrictive covenant and defendants should be enjoined specifically, among other things, from divulging such confidential information to plaintiff's competitors and from otherwise taking advantage of such confidential information in violation of their employment agreements.

The Court's injunction will also apply directly to Blue Line Corporation since it is owned and controlled by Potter

---

(1922). Such a contract has also been held to be divisible, with the valid portion being enforced. Hood v. Legg et al., 160 Ga. 620(4), 128 S.E. 891 (1925).

and Summers and each covenanted not to compete "directly or indirectly, by himself or in conjunction with any person, firm or corporation  *  *  * ".

### Oregon Law

■ This Court may take judicial notice of Oregon law without the necessity of pleading or proof. Reeves v. Schulmeier, 303 F.2d 802 (5 Cir. 1962) and cases cited therein.

Pertinent Oregon cases on this subject are: Eldridge v. Johnston, 195 Or. 379, 245 P.2d 239 (1952); Kelite Products, Inc. v. Brandt, 206 Or. 636, 294 P.2d 320 (1956); McCombs et al. v. McClelland, 223 Or. 475, 354 P.2d 311 (1960), and Perthou v. Stewart et al., 243 F.Supp. 655 (D.C.Or.1965). From a review of these decisions, the Court concludes that the non-competition covenant contained in the agreement executed by Floyd Martin is a valid and enforceable one under Oregon law.

■ The Court is aware that Martin performed activities in and had geographical responsibilities with respect to the five southeastern states only during the last 4½ weeks of his employment by plaintiff. It should be emphasized, however, that this was due entirely to Martin's voluntary act and not to any fault on the part of plaintiff, and Martin thus has no standing in a court of equity to rely upon the briefness of this period as a basis for avoidance of his contractual obligations. During this 4½ week period he functioned as Assistant General Sales Manager of plaintiff and shared responsibility with Jensen for the warehouses in Georgia, Alabama, Florida, and North Carolina, serving all of plaintiff's customers in those states and South Carolina; he personally visited these warehouses and conferred with the managers, who were his subordinates; and he had complete access to all records and information of a confidential nature concerning plaintiff's customers in this area.

■ Under Oregon law, e. g. Kelite Products, Inc. v. Brandt, supra, a rea-sonable restriction as to territory may be implied even in the absence of an expressed territorial limitation. The Court will construe the contract, under the facts and circumstances, as applying to the same five state southeastern area applicable to the defendants Potter, Summers and Blue Line Corporation. Such a holding is consistent with equity and justice since Potter, Summers and Martin, and Blue Line Corporation, are acting in concert in violating the restrictive covenants.