[Civ. No. 15681.   First Dist., Div. One.   Feb. 24, 1954.]

OLGA LOUKNITSKY, Appellant, v. VLADIMIR LOUK-NITSKY, Respondent.

Olga Louknitsky, in pro. per., for Appellant.

Alfred J. Hennessy for Respondent.

WOOD (Fred B.), J.—Plaintiff Olga Louknitsky has appealed from an interlocutory decree which awarded her a divorce upon the ground of extreme cruelty. She asserts error in (1) the finding that all the property belonged to the community, (2) the portion of the judgment which ordered sale of the realty and division of the proceeds, and (3) failure to award alimony to her.

The parties waived findings of fact. However, the court included in the introductory portion of the decree a finding that from all the evidence it appeared "that all the material allegations of the complaint are true, save and except that, that certain real property commonly known as No. 248 - 10th Avenue, San Francisco, California, and the contents thereof, consisting of household furnishings and equipment, linens and dishes, is the community property of the parties hereto, and

such is found to be the fact.'' Also appellant has furnished a reporter's as well as a clerk's transcript.

(1) *Does the evidence support the finding that the property described is community property?*

There is substantial evidence that the major portion of the funds* available for investment in the property described were derived from the earnings and the proceeds of the earnings of the husband, defendant Vladimir Louknitsky, while the parties resided in Shanghai, China, before coming to California.

There being no evidence concerning the applicable laws of China or of Hongkong (where they resided for a short time before coming to California), those laws are presumed to be the same as the laws of California. (*Christ* v. *Superior Court,* 211 Cal. 593, 598 [296 P. 612].) Accordingly, the funds acquired in China, under the circumstances indicated, are deemed community property. Olga came to this country, directly to California, some little time ahead of Vladimir, who joined her here. Each has resided here ever since arrival.

The only other source of funds since they took up residence in this state has been the compensation received by either of them when gainfully employed. For a period of about 10 months after her arrival here, he sent her $70 a month from his earnings. There is evidence that since his arrival he has been paying the installments on the purchase price mortgages which she executed upon acquiring the house and lot in San Francisco.

There are only two factors which might cast a doubt upon the community character of the property thus acquired.

In January, 1946, Vladimir left Shanghai for Indo-China as a member of the French police. Prior to departure he endorsed certain checks to Olga for collection, the funds being ''frozen,'' and assigned to her the lease of the premises in which they resided, so that she might sell it and join him. She also sold a piano, and then joined him in Hongkong.

She later decided to come to this country. Shortly prior to her leaving he executed the following document: ''Hongkong, September 23rd, 1947, to whom it may concern: I, the undersigned, state that I have no objection to the departure for the United States of America of my wife, Olga Louknitsky, and our son, Vladimir Louknitsky, thirteen years of age, and

---

*Those funds also included about $700 received by Olga in settlement of a claim of hers for injuries caused by the negligence of a medical or dental practitioner.

I shall not have any claims to money my wife has in her possession. (sgd.) V. Louknitsky.''

Olga claims that Vladimir's execution and delivery of this document had the effect of an ''engagement or transaction'' or ''contract'' between them, as husband and wife, converting into her separate property all of the money and property mentioned. (See Civ. Code, §§ 158 and 159.' That does not necessarily follow, in view of the circu゛ ゛ ゛ which attended that transaction.

Asked if her husband gave her ' 　 le stated
he had no claim on the money, 　 ̄ ̄s—and
but for—unless I had this mo゛ 　 eft; I
could not have left without th' 　 he com-
munity funds above describ 　 sked and
the witness replied: ''Wel' 　 n you are
getting a visa in China an 　 , before you
can come into the United 　 hat you have
enough money of your 　 a; and isn't it
true that in order for 　 ted States, your
husband signed for 　 was your money,
because otherwise y 　 the visa? A. You
see, your Honor, 　 I came here with a
non-preference v' 　 to wait for this visa,
and nobody ask 　 y in the United States
Consulate.'' ゛ 　 , asked if her husband
signed that r 　 be able to come into the
United Stat 　 led that I had the money.''
Asked if h 　 bled her to come in and to
bring hir 　 , if you say so.''

Vlad゛ 　 led and gave Olga that paper,
addin゛ 　 otherwise she wouldn't be able
to cゥ 　 conclusion of the trial, the court
ma゛ 　 we come to the house and there
is 　 that that is community property
anu ゛゛ 　 an order for the sale of this house
and for the 　 the amount of money realized there-
from. Then eac゛ 　 an purchase a place if he or she desires
to do so and I feel that that is fair to both sides.''

It was competent for the trial court to draw the inference that the community character of the property involved was not intended to be changed and was not changed by the paper which Vladimir signed and gave to Olga upon the eve of her departure for America. It did not take the form of a bilateral agreement between them. She was not a formal

party to the instrument, nor did she sign it. The paper did not speak of the character of the money (whether community or separate property for example) or of an intended change in its character. It merely said he had no objection to the departure of his wife and son and that he would "not have any claims to money my wife has in her possession." That, conceivably, evinced merely an intent that she have and be able to show to the appropriate immigration officials that in seeking to enter this country she possessed a substantial sum of money (over $4,000) available for her support and that of her son, after their arrival. Such interpretation is supported by the testimony of both parties that he gave her this paper to enable her to enter the country.

The intent of the parties in such a transaction is a question of fact for determination by the trial court; a determination that is not to be disturbed when, as here, supported by the evidence. (*Perdicalis* v. *Perdicalis*, 92 Cal.App.2d 274 [206 P.2d 650].) Certainly, we cannot hold, as a matter of law, that the transaction described operated to convert that money from community property into separate property of the wife.

■ The other factor which might cast a doubt upon the community character of the house and lot acquired in San Francisco, inheres in the fact that the deed of conveyance ran to Olgo only, not to Olga and Vladimir as grantees. Normally, in such a case, there arises a disputable presumption that land thus conveyed is the separate property of the wife; in this case, Olga. (Civ. Code, § 164.)

However, the purchase was made and the deed executed and delivered before Vladimir's arrival here. He testified that he did not know until some time after the event, that she took the property in her name only; also, that after his arrival here he paid all the installment payments on the mortgage until he was "vacated" by the court from the house, some time prior to the trial. These circumstances, particularly the husband's lack of knowledge at the time of the purchase that Olga was the sole grantee and the absence of any agreement that the money, already held to be community property, should be converted into separate property by the wife's investing it in her name, tend to rebut the presumption. There is thus ample support for the trial court's finding that the home property belongs to the community.

(2) *We find no error in the division which the court made of the community property.*

The court awarded the wife all the household furnishings

and equipment, linens and dishes, and then ordered Vladimir to make all payments on the real estate mortgages for six months (Olga to occupy the home during that period, rent free), the home to be sold and the proceeds equally divided between them. This alone gave the wife more than half the community property. It comports with the division sanctioned by statute (Civ. Code, § 146), which commits the segregation and allotment of the community property to the sound discretion of the trial court, when a divorce is decreed upon the ground of extreme cruelty. (See *Webster* v. *Webster*, 216 Cal. 485 [14 P.2d 522].) ▮ The nonoffending party is entitled to more than one-half in such a case. ▮ The question of the amount of the award in excess of 50 per cent is largely in the discretion of the trial court. (*LeFiell* v. *LeFiell*, 108 Cal.App.2d 321 [239 P.2d 61].) The trial court has authority to order the sale of community property and a division of the proceeds if partition is not practicable. (Civ. Code, § 147.) It would not seem practicable to divide a single family dwelling house.

Appellant directs attention to the award to her of all bank accounts standing in her name and questions that award because, she asserts, there are no such bank accounts. Our attention has not been directed to any testimony on this subject. We do find that in describing the travelers' and other checks which she brought into this country, appellant spoke of two checks (the proceeds of the sale of a lease in China) which she said "were combined; and the money is here; I· have a statement from the bank"; and that the amount is $812. This, apparently, is what the court had in mind when awarding Olga all bank accounts standing in her name. In her opening brief appellant refers to this as "check No. 10562 of the National City Bank of New York for $ U.S. dollars·811.49" and says it "was given to the appellant by her husband when he was leaving Shanghai for Indo China. At that moment this check was still 'frozen' in the bank could not be cashed by the defendant and he endorsed it to his wife." We interpret the award of bank accounts standing in Olga's name as including an award of this check to her. The value of this check, whatever it is, adds to the share of the community property awarded appellant. We find no error in this portion of the decree.

▮ (3) *Appellant assigns as error the failure of the court to grant her alimony.* We find no error in it.

Both parties are gainfully employed. Their only child, a son 18½ years old, was in active military service at the time of the trial. The order that the husband make the mortgage payments for six months (the wife to enjoy possession rent free) and the award of attorney fees to the wife, coupled with other factors discussed herein, indicate no basis for a reviewing court to find that the trial court committed any abuse of discretion in not granting alimony as such.

Moreover, it appears that at the conclusion of the trial the court stated the awards which would be made and would not be made, expressly stating that there would be no alimony. Thereupon appellant's counsel suggested that findings be waived, and they were waived. If appellant had any additional evidence bearing upon her need for alimony, then was the time to request a reopening of the case to offer it.

There remains for consideration a motion by the defendant to strike plaintiff's reply brief from the files of the court upon the asserted ground that it consists if irrelevant and scandalous statements.

We have examined that brief. It does treat of a number of matters that are not in the record, but a litigant who appears in his or her own behalf and is not an attorney should not be held to the same standard in that regard as a member of the State Bar. However, the brief does contain some matter that is scandalous in nature as well as outside the issues and the record. Those portions should be stricken.

The judgment is affirmed. That portion of appellant's reply brief which begins with the first full paragraph on page 4 thereof and ends at the bottom of page 7 is stricken from the brief.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied March 26, 1954.