**OLD HICKORY PRODUCTS CO., LTD.**

v.

**HICKORY SPECIALTIES, INC. and Don E. Crace, Individually and as President of Hickory Specialties, Inc., Defendants and Third-Party Plaintiffs,**

v.

**HARTFORD ACCIDENT & INDEMNITY COMPANY, Third-Party Defendant.**

**Civ. A. No. 17045.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Nov. 21, 1973.

**914**

Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for plaintiffs.

Swift, Currie, McGhee & Hiers, Atlanta, Ga., for defendants.

N. Forrest Montet, Atlanta, Ga., for Hartford.

## ORDER

EDENFIELD, District Judge.

Hickory Specialties, Inc. and its president, Don E. Crace, were sued by Old Hickory Products Company, Ltd. for wrongful appropriation of its trade secrets, interference with contractual relations with one of its employees, and, particularly relevant to the issues to be decided here, for unfair advertising and marketing which confused customers and the public as to the identity of the goods being sold. Hartford Accident and Indemnity Company was obliged under its contract of insurance to defend Hickory Specialties against any suit alleging certain acts, as defined and limited in its policy, even if such suit were groundless, false or fraudulent. Demand was made on Hartford to defend the present suit by Old Hickory but Hartford refused on the grounds, inter alia, that the acts complained of did not fall within the policy's coverage. Hickory Specialties then employed its own counsel to defend it in the main action and filed a third-party complaint against Hartford for any and all sums on which it might be found liable. The main dispute between Old Hickory and Hickory Specialties has now been settled, and the action is presently before the court on respective motions for summary judgment on the third-party complaint. For simplicity, third-party plaintiffs Hickory Specialties, Inc. and Crace will hereafter be collectively referred to as "Hickory" or "plaintiff", and third-party defendant, Hartford Accident and Indemnity Company, will hereafter be referred to as "Hartford" or "defendant." The court has independent jurisdiction of the third-party complaint under 28 U.S.C. § 1332, as well as ancillary jurisdiction

The parties have submitted a copy of the Hartford Accident and Indemnity Company policy and have stipulated to its authenticity and correctness. They stipulate also that the contract was entered into and delivered in the State of Florida, and agree that under Georgia law the construction of a contract is governed by the law of the place of its making; in this instance, the State of Florida.

Defendant argues for summary judgment on the grounds that under Florida law the obligation of an insurer to defend an action against the insured is measured by the allegations in the plaintiff's pleadings, and the original plaintiff's pleadings in the instant case alleged conduct by Hickory which is excluded from coverage under the policy. Plaintiff maintains that while Florida law governs the construction of the contract, this court under Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and Klaxon Co. v. Stentor Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), must apply the interpretation that the courts of Georgia would give to Florida law. Under that interpretation, plaintiff argues, defendant had a duty to defend, regardless of the pleaded allega-

tions, where the true facts of the complaint afforded coverage to the plaintiff and were known or reasonably ascertainable by Hartford. Tennessee Corp. v. Hartford Accident & Indemnity Co., 463 F.2d 548, 550–551 (5th Cir. 1972); Associated Petroleum Carriers v. Pan American Fire & Casualty Co., 117 Ga. App. 714, 161 S.E.2d 411 (1968); State Farm Mutual Automobile Insurance Co. v. Keene, 111 Ga.App. 480, 142 S.E.2d 90 (1965); Loftin v. United States Fire Insurance Co., 106 Ga.App. 287, 127 S. E.2d 53, 57–58 (1962).

. Whether the court must apply the law of Florida, or Georgia's interpretation of Florida law, will not make a great deal of difference to the ultimate rights and liabilities of the parties. Recent Florida cases have refused to find that an insurer's obligation to defend is to be determined solely on the basis of pleaded allegations. The court is bound, however, to decide which law will govern the case at bar, and in so doing must examine a curious body of judicial presumptions dating from at least the Georgia Supreme Court of 1866. These presumptions are today at variance with reason and operate in the total absence of the administrative necessity by which they may have once been justified.

## I. THE GEORGIA PRESUMPTIONS

■ In the first instance, there is no question that the general choice-of-law rule announced by the Georgia courts is that the construction of a contract is to be governed by the law of the place of its making, unless it shall appear that the writings or contracts are intended to

have effect principally within the State of Georgia. Beck & Gregg Hardware Co. v. Southern Surety Co., 44 Ga.App. 518, 162 S.E. 405 (1931); Ga.Code Ann. § 102–108. There is no dispute that under this rule Florida law governs the present case. Passing this threshold question with little difficulty, however, the court is confronted by an array of Georgia state court decisions which elaborate an intriguing doctrine. These decisions hold that in order for a foreign statute to be considered by a Georgia court, it must be pleaded and proved in the same manner as any other fact. The case law of a foreign state may then be consulted when it is interpretative of that statute. But where, as in this case, no foreign statute exists relative to the disputed issue, and none is therefore pleaded, the Georgia courts will presume that "the common law" prevails in that state, and the courts of Georgia will not be bound "by the interpretation of the common law made by the courts of a foreign state, but will decide what is the common law." Gorman v. Griffin, 70 Ga.App. 585, 589, 28 S.E.2d 897, 899 (1944); Jesse Parker Williams Hospital v. Nisbet, 189 Ga. 807, 811, 7 S.E.2d 737 (1940) [hereinafter *"Hospital"*]; Record Truck Line, Inc. v. Harrison, 109 Ga.App. 653, 137 S.E.2d 65 (1964); Budget Rent-A-Car Corp. v. Fein, 342 F. 2d 509 (5th Cir. 1965).[1] In the present action, then, while paying lip-service to the notion that Florida law should govern the construction of a contract made in Florida, under the cases cited above the Georgia courts would apply Georgia's interpretation of "the common law", or more simply, Georgia law.[2]

---

1. Thus the Georgia Supreme Court in Krog v. Atlanta R.R., 77 Ga. 202, 203 (1886), said, "This court is not bound by the interpretation of the common law made by the courts of Alabama, although the injury for which the suit is brought occurred in that State, but this Court will decide what is the common law. As to the construction which the courts of that State place upon its own statutes or other local laws bearing upon the case, this Court will follow their decision."

2. Actually, things are a bit more complicated than the foregoing discussion would indicate.

Georgia will *presume* that the common law of England prevails *only* in those states which constituted one of the original thirteen colonies, or which was derived from territory included in one of such colonies. Green v. Johnson, 71 Ga.App. 777, 32 S.E.2d 443 (1944); Record Truck Line, Inc. v. Harrison, *supra*. As to these states, in the absence of a pleaded foreign statute, Georgia will apply its interpretation of the common law. As to all other states, however, there is no presumption that the common law prevails, even though it may have been adopted

## II. THE GEORGIA PRESUMPTIONS DO NOT CONTROL THE CASE AT BAR

■ For two reasons, the court finds that it is not bound by the decisional doctrine outlined above, and that it is therefore Florida law which governs Hartford's obligation to defend on its insurance policy with Hickory.

A. The federal court may take judicial notice of foreign law regardless of state court practice.

■ First, this court cannot be bound by the self-imposed inability of the Georgia courts to judicially notice the law of her sister states. As stated by the Supreme Court in Lamar v. Micou, 114 U.S. 218, 223, 5 S.Ct. 857, 859, 29 L.Ed. 94 (1885), "The law of any State of the Union, whether depending upon statutes *or upon judicial opinions,* is a matter of which the courts of the United States are bound to take judicial notice, *without plea or proof.*" (Emphasis supplied.) *See* Owings. v. Hull, 34 U.S. 607, 9 Pet. 607, 9 L.Ed. 246 (1835); Covington Drawbridge Co. v. Shepherd, 61 U.S. 227, 232, 20 How. 227, 15 L.Ed. 896 (1857); Hanley v. Donoghue, 116 U.S. 1, 6, 6 S.Ct. 242, 29 L.Ed. 535 (1885); Schultz v. Tecumseh Products, 310 F.2d 426 (6th Cir. 1962). This rule announced by the Supreme Court has not been obviated by the decision in Erie R. R. v. Tompkins. Rather, the decisions of the federal courts subsequent to Erie "have been virtually unanimous in sanctioning a federal court's continued application of the practice of taking judicial notice of the law of all the states without pleading or proof, regardless of the forum state's rule on the subject." Miller, Federal Rule 44.1 and the Fact Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine, 65 Mich.L.Rev. 615, 732–733 (1967) [hereinafter cited as *"Miller"*]. "In *Erie,* itself, the Supreme Court remanded the case for the application of Pennsylvania law, although at that time New York, the forum state, did not judicially notice the law of sister states." *Miller, supra* n. 424. And as explained by Judge Kloeb in Baltimore & O. R. R. v. Reaux, 59 F.Supp. 969, 975 (N.D. Ohio 1945), "The doctrine of judicial notice is not a conflict of laws rule. In discussing this same question the court, in Petersen v. Chicago, Great Western Ry. . . . called it a 'rule of pleading and evidence rather than of substantive law . . .' A concise and well-reasoned statement on this question is that of Judge Goodrich in Gallup v. Caldwell . . .: 'This rule as to judicial notice is not affected by Erie R. R. v. Tompkins . . . . That case dealt with the question of the application of the substantive law of a given state, not how such substantive law is brought to the attention of a federal court . . . [citations omitted].' "

In support of its argument that Georgia law must govern the issue in question, plaintiff has cited Budget Rent-A-Car Corp. v. Fein, *supra* [hereinafter *"Budget"*], in which the Fifth Circuit Court of Appeals applied Georgia common law where the applicable Georgia statute indicated that North Carolina law should govern. Aside from being very much in the minority, *see, e. g.,*

---

by statute, *Hospital, supra,* and where there is no common law presumption, "then it must be presumed that the applicable law of such foreign state is identical with the lex fori . . ." Reliance Realty Co., Inc. v. Mitchell, 41 Ga.App. 124, 126, 152 S.E. 295 (1930). This presumed identity of law in states other than those carved out of the original thirteen colonies appears to extend to Georgia's statutory law, as well as to its interpretation of the common law. *Reliance Realty Co., supra; Hospital, supra* and cases cited at 811–812, 7 S.E.2d 737; Capital

Automobile Co. v. Continental Credit Corp., 117 Ga.App. 451, 160 S.E.2d 836 (1968). *But see* Ohio S. Express Co. v. Beeler, 110 Ga.App. 867, 140 S.E.2d 235 (1965). Applying this doctrine to the case at bar, since Florida was not one of the thirteen colonies or derived therefrom, *Hospital, supra* at 812, 7 S.E.2d 737, the insurance policy made in Georgia and acknowledged to be governed by Florida law would in fact be construed in accordance with the applicable statutory and decisional law of Georgia, presumed to be identical to that of Florida.

Professor Moore's discussion and cases cited in 1A Moore's Federal Practice and Procedure, ¶ 0.316 [4], the court's application of Georgia law in *Budget* was done without discussion of the strong authority compelling federal courts to take judicial notice of state law when confronted by a forum state presumption against recognizing the laws of sister states. The complete absence of treatment given to this issue, which other courts have dealt with in detail, leads this court to believe that the Court of Appeals assumed that Georgia law was applicable, without reaching the question of whether the district court *should* take judicial notice of North Carolina law. Indeed, in the one case in which the Court of Appeals has considered the question of judicial notice, Reeves v. Schulmeier, 303 F.2d 802 (5th Cir. 1962), the court found that "there is no need to allege or prove state law in the federal courts . . . notwithstanding state law which requires special pleadings and proof." At 807.[3] This court finds that the application of Georgia common law in *Budget* was not meant to place the Fifth Circuit in opposition to the mainstream of judicial thinking in this area. Rather, the court notes the holding in *Reeves, supra,* and finds that it is bound to judicially notice the laws of Florida. Lamar v. Micou, *supra.* *See* Tarbert v. Ingraham Co., 190 F.Supp. 402, 406 (D.C.Conn.1960).

B. The judicial presumptions no longer constitute valid law since enactment of Ga.Code Ann. § 81A–143(c).

The second reason for finding that Florida law governs Hartford's obligation to plaintiff is that the Georgia legislature has rescinded the judicial doctrine requiring the pleading and proof of foreign statutory law, and the absolute presumption against recognizing foreign court decisions. Subsection (c) to Ga.Code Ann. § 81A–143, Acts of 1968, pp. 1104, 1108 [hereinafter "§ 143(c)" or "the Act"], reads as follows:

> "(c) *Determination of the law of other jurisdictions*
>
> A party who intends to raise an issue concerning the law of another State or foreign Country shall give notice in his pleadings or other reasonable written notice. The court, in determining such law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the rules of evidence. The court's determination shall be treated as ruling on a question of law."

On its face the Act ends the requirement that foreign law must be pleaded and proved, substituting instead the requirement that a party who will introduce the law of a foreign state or country must give "reasonable written notice" of his intention. The court believes that the express language of Section 143(c) is, itself, sufficiently clear to find that the legislature intended to repeal a judicially created doctrine which has long since outlived its usefulness. Further discussion of the origins of the old presumption and the intended effect of the Act, however, would be helpful to more fully establish this conclusion.

After diligent search the court has, unfortunately, been unable to find in the records of the Georgia House and Senate any debate or discussion explaining the Act's purpose, or stating the reasons behind its passage. Since § 143(c) is identical in all relevant respects to Rule 44.1 of the Federal Rules of Civil Proce-

---

3. The finding by the court in *Reeves* was cited in Mouldings v. Potter, 315 F.Supp. 704 (M.D.Ga.1970), where the district court held that it "may take judicial notice of Oregon law without the necessity of pleading or proof." At 716. In *Mouldings* the court was asked to interpret and enforce certain employment agreements, which it proceeded to do without mention of the Georgia state court presumption, even though the court specifically relied on *Budget* for controlling precedent on the reasonableness of territorial restrictions in employee contracts prohibiting competition.

dure, the court feels it appropriate to draw on materials and cases interpreting and explaining the need for the comparable federal rule. There is no question that the Georgia courts look to federal law in interpreting the recently enacted Civil Practice Act, Ga.Code Ann. § 81A, Act 1966, pp. 609, et seq., which adopts the federal rules, and the Georgia courts have specifically relied on Rule 44.1 in interpreting § 143(c).[4] *See* Taylor v. Donaldson, 227 Ga. 496, 181 S.E.2d 340 (1971); Atlanta Newspapers, Inc. v. Shaw, 123 Ga.App. 848, 182 S.E.2d 683 (1971).

From Professor Arthur R. Miller's excellent treatment of the state of the law prior to the enactment of Rule 44.1, *Miller, supra* at 6 [of this opinion], it is clear that there is nothing unique in the origins of Georgia's judicial requirement that foreign law must be pleaded and proved, and its presumption of identity between Georgia and foreign decisional law. Although Miller's article concerns the effect of Federal Rule 44.1 on the federal courts' ability to judicially notice the laws of foreign countries, his discussion is equally applicable to the Georgia judicial doctrine and § 143(c).

According to Miller, the doctrine that foreign law was to be pleaded and proved as any other fact was adopted uncritically in America as part of the English common law. While "blind obedience" to ancient Anglo-Saxon precepts explains the doctrine's introduction into the United States, Professor Miller states, "[A] concatenation of factors can be suggested" for its perpetuation. Among these factors are: "the enormous size of the United States, its ingestion during the nineteenth century of several large land masses having cultural and legal frameworks radically different from those found in the original union—events that reinforced the tendency of state court judges to character-

ize the law of a sister state as foreign; the nation's relatively long isolation from other legal systems; the philosophy of state sovereignty, generated during the colonial and confederation periods and never completely eradicated; and an admixture of by-products of the policy's federal character." *Miller, supra,* at 619. In addition, and "on a more mundane but highly pragmatic level," was the difficulty of procuring foreign law materials, and the reluctance felt by judges to decide cases based on foreign state laws with which they were wholly unfamiliar. Whatever the reasons for continued adherence to borrowed English tradition, and however invalid those reasons may be, there is no doubt that today, such tradition has persisted in Georgia at least up to the passage of § 143(c).

■ At the heart of Georgia's treatment of foreign law is the common-law dictate that a party who relies on foreign law must plead it. Whatever gloss may have been added by the Georgia courts over the decades, the ultimate origin of the recent refusal to recognize the laws of sister states rests on the common-law treatment of foreign law as a question of fact and the requirements of pleading and proof. In Selma, Rome & Dalton R. R. v. Lacy, 43 Ga. 461 (1871), for example, the plaintiff Lacy brought an action to recover damages for her husband's death in Alabama, allegedly owing to the negligence of the defendant railroad. The Georgia Supreme Court reversed the trial court and sustained the defendant's demurrer on the grounds that plaintiff had not pleaded or proved any law of Alabama entitling her to bring the action, and that at common law plaintiff could not have sued for damages occasioned by the death of her husband. Said the court, "There is no allegation in the plaintiff's declaration as to what is the law of the

---

4. The only difference between the Act and Rule 44.1 is that the latter is addressed to the federal courts' determination of the laws of a foreign country, whereas Section 143(c) governs the state courts' consideration of laws of other states, as well as other countries. For purposes of the following discussion, references to "foreign law" will include both the laws of Georgia's sister states and those of foreign countries.

State of Alabama in relation to the alleged cause of action, and in the absence of any such allegation, the Courts of this State will presume that the common law applicable to the alleged cause of action is of force in that State. By the common law, the plaintiff could not have maintained her action against the defendant for death of her husband." At 463.

The *Lacy* case is the earliest Georgia decision this court has been able to find specifically giving effect to the requirement that foreign law must be pleaded. In addition to clearly stating the common-law requirement of pleading, the case is instructive on the origins of the presumption that, unless otherwise pleaded, "the common law" will be assumed to apply in the foreign jurisdiction whose laws are recognized as governing the action. It is important to note that although Mrs. Lacy failed to allege the law supporting her cause of action, the Georgia Supreme Court was prepared to ameliorate the usual result of failure to prove the applicable law—dismissal of the lawsuit instanter—by invoking the presumption that common law applied. While the presumption of common law did no practical good for Mrs. Lacy, for other plaintiffs (or defendants) who failed to allege or prove the applicable foreign law the presumption was very definitely a salutary one. At least the hapless party who failed to properly plead would not find his claim or defense immediately dismissed. He still might prevail if he could find support for his position in the common law. In Woodruff & Co. v. Saul, 70 Ga. 271, 273 (1883), for example, plaintiff sued Saul for the sum of $116.05, based on a fraudulent "contract of composition" made in Tennessee. Plaintiff failed to plead the law of Tennessee, recognized by the court as governing the cause of

action, but nonetheless prevailed on his claim thanks to the presumption, announced by the court, that "if nothing else appear, [*i. e.*, is pleaded] [5] the rules of the common law prevail there. . . ."

Of importance to the effect of § 143(c) on the continued validity of the Georgia pleading requirement and common-law presumption is the fact that the "presumption of identity" was not cut from whole cloth as a latter-day adjunct to the Georgia choice-of-law doctrine, but rather was an integral part of the common-law procedural requirement that foreign law had to be pleaded and proved. As shown in the above-cited cases application of the presumption could prevent the harsh consequences of a failure to observe that requirement, *i. e.*, outright dismissal, although failure to plead a necessary statute would still bar a cause of action wholly dependent on such statute. *See, e. g.*, Green v. Johnson, 71 Ga.App. 777, 32 S.E.2d 443 (1944). Against the proposition that the Georgia courts would be bound to judicially notice Florida law, plaintiff Hickory argues that § 143(c) concerns "only the method of pleading and proving foreign law, and has nothing to do with whether or not the particular foreign law will be applied by a Georgia court under its substantive choice-of-law rule." This argument assumes that the "presumption of identity" is in fact part of the Georgia conflicts-of-law rule applicable to foreign contracts. The cases do not support this assumption. As was stated earlier, the choice of which law shall apply in this action was clearly established by the Supreme Court of Georgia and the Georgia Court of Appeals to be the law of the state where the contract was made. Said the court in *Hospital, supra*, "Where a pleaded contract not only is executed in a foreign state,

5. This presumption of identity of common law is not unique to Georgia, but was widely used in the federal courts prior to the enactment of Rule 44.1 to avoid the consequences of the Supreme Court's decision in Cuba R. R. v. Crosby, 222 U.S. 473, 32 S.Ct.

132, 56 L.Ed. 274 (1912), in which an employee's action against his employer for personal injuries sustained in Cuba was dismissed, because Cuban law was not established. *See Miller* at 633, 693–694.

but contains nothing to indicate by the place of performance or otherwise that it was intended to be construed as a Georgia contract, it will be treated as a contract of the foreign State, and governed by its laws [citations omitted]." At 811, 7 S.E.2d 737, 740. In Green v. Johnson, *supra*, cited by plaintiff, the court began its discussion of the applicable law by stating, "The lex loci governs as to all substantive matters and the lex fori as to matters affecting the remedy or procedure. [Citations omitted.]" The applicable Georgia statute reads: "Lex loci governs, when.—When writings or contracts are intended to have effect in this State, they must be executed in conformity to the laws of this State, excepting wills of personalty of persons domiciled in another State or country." Ga.Code Ann. § 102–108. In no case, to this court's knowledge, has the Georgia Supreme Court ever determined which of two state laws governed a particular action on the basis of the presumption that foreign decisional law was identical to that of the State of Georgia. The presumption of identity has always been invoked after the ritual incantation that no law or statute of the controlling state was pleaded. To the court, this careful separation between the controlling state law and the interpretation to be given to that law demands the conclusion that the presumption of identity, rather than being a substantive choice-of-law rule, is part and parcel of Georgia's adherence to the common-law rule that foreign law be pleaded and proved.

As stated previously, the adoption of the identity presumption most probably was born out of a need to prevent the harsh consequences of dismissing an action for failure to prove the applicable foreign law, when neither the litigant nor the court had sufficient legal material or time to make the needed determination. With the enactment of Rule 44.-1 on the federal level and the counterpart § 143(c) in Georgia, the requirement of pleading and proof of foreign law as a question of fact was discarded along with the attendant presumption of identity.[6]

That the enactment of § 143(c) brings needed reform to Georgia's treatment of foreign law cannot be gainsaid. Some of the problems inherent in applying a "presumption of identity", which § 143(c) now avoids, are noted by Professor Miller in connection with the case of Louknitsky v. Louknitsky, 123 Cal.App. 2d 406, 266 P.2d 910 (1954), in which Chinese marital-property law was presumed to be the same as California's community property law. Citing *Louknitsky* as an "extreme example" of applying a presumption of identity, Professor Miller states: "Given its use in *Louknitsky* qualms about the presumption assuming Frankenstein qualities are understandable, especially when it is realized that the task of overcoming it usually will fall on a party who, absent the presumption, would not have the burden of establishing the existence of a cause of action or defense under foreign law. Thus, a plaintiff with a valid cause of action under forum law but none under the governing foreign law may reap the benefits of the presumption at the expense of a somnolent defendant or one who lacks the resources to investigate foreign law. Moreover, the party who normally has the burden of showing that domestic and alien law diverge often will remain silent because

6. At most, the presumption of identity is a rule of evidence, limiting the admissibility of evidence on the asserted factual question of foreign law. *See, generally, Miller* at 732–748. There is no serious question that Rule 44.1, containing a conflicting rule of evidence, is within the scope of the Rules Enabling Act of 1934, *Miller* at 738–748. This court has no doubt that the Georgia legislature at least intended to change an evidentiary practice of the Georgia courts dating back to ancient precepts of Anglo-Saxon common law, through its enactment of § 143(c) of the Civil Practice Act. In the words of one commentator, "The Civil Practice Act (Acts 1966, p. 609, et seq. effective September 1, 1967) is obviously intended to be a revolutionary and sweeping revision of Georgia legal procedure." Title 81A, Ga. Code Ann., at 3.

domestic law is favorable to him, although in many instances he may be the party in the best position to prove the foreign law." *Miller*, at 636. Not to be omitted from the difficulties inherent in a presumption of identity is the unreality attendant to a doctrine which insists that the common law of Georgia and Florida are the same, when a look into the Southern Reporter, forbidden by that presumption, would show that they are not.

What then is the effect of the new § 143(c)? To paraphrase Professor Miller's explanation of the corresponding Rule 44.1, "The new [section] permits the court to consider any material that is relevant to a foreign-law issue, whether submitted by counsel or unearthed by the court's own research, and without regard to its admissibility under the rules of evidence. The purpose of this provision is obvious. One of the objectives of the [section] is to abandon the fact characterization of foreign law and to make the process of determining alien law identic with the method of ascertaining domestic law to the extent that is possible. Thus the trial judge's freedom of inquiry no longer is encumbered by restraints on his research or by the rules of admissibility, which may be useful in the context of fact issues tried to a jury but are of no utility in establishing the content of foreign law." At 657. Of particular importance to the proper application of the section is the policy inherent in § 143(c) that "whenever possible, foreign-law issues should be resolved on their merits and on the basis of a full evaluation of the available materials. To effectuate this policy, the court is obliged to take an active role in the process of ascertaining foreign law. The notice requirement and the mode of proof were deliberately left flexible and informal to encourage court and counsel to regard the determination of foreign law as a co-operative venture requiring an open and unstructured dialogue among all concerned. Thus, a judicial practice of automatically refusing to engage in research or to assist or direct counsel would be inconsistent with one of the Rule's basic premises." *Miller*, at 661 [citations omitted]. Under the new section, there is no question that the Georgia courts would be bound in this action to consider evidence of Florida law.

Since passage of § 143(c) in 1968 the Georgia Court of Appeals has been unanimous in holding that § 143(c) controls determination of substantive foreign law. In Smith v. Davis, 121 Ga. App. 704, 175 S.E.2d 28 (1970), the defendant objected that the trial court erred in recognizing the Sourthern Reporter as proof of Florida law, citing the 1949 decision of Carter v. Graves, 206 Ga. 234, 236, 56 S.E.2d 917, holding that the Pacific Reporter "was not shown to be such a publication as is 'published by authority' so as to authorize the trial court to take judicial cognizance thereof." In holding for the plaintiff, the Court of Appeals noted that § 143(c) provided that "The court in determining such [foreign] law, may consider any relevant material or source," and that the new section superceded the holding of the Georgia Supreme Court in Carter v. Graves. In Atlanta Newspapers, Inc. v. Shaw, 123 Ga.App. 848, 182 S.E.2d 683 (1971), the Court of Appeals had before it essentially the same problem presented in Selma, Rome & Dalton R.R. v. Lacy, *supra*. Plaintiff was suing for the wrongful death of her husband occasioned by defendant's negligence in North Carolina, and had failed to plead the North Carolina wrongful death statute giving her a cause of action. When plaintiff moved to amend her complaint to include the applicable statutes after the action had been filed, defendant objected that under Georgia procedure the amendment was barred, and the complaint had to be dismissed for failure to state a claim. The Court of Appeals held for the plaintiff, finding that defendant's argument depended on the assumption that foreign law must be pleaded if relied upon and that in the absence thereof the common law would be presumed to apply. This

argument, said the court, was. valid prior to the enactment of the Civil Practice Act, but that under the Act plaintiff was no longer required to plead the applicable foreign law, and her complaint, even without specific reference to the laws of North Carolina, stated a cause of action. In so holding, the court found that § 143(c) was equivalent to Federal Rule ˙44.1, and the construction given to the federal rule was applicable to the state statute. Said the court, "Perhaps more analogous is the practice in federal courts where a claim relies on the law of a foreign country of which the federal courts do not take judicial notice. Rule 44.1 does not demand that such law be pleaded. . . . [After quoting Rule 44.1 and citing Ga.Code Ann. § 81A–143(c)] we hold that the original complaint in the case sub judice, which is attacked for not pleading the law of North Carolina, did not fail to state a claim on that account. It was sufficient in stating a claim as measured by notice pleading standards." At 851, 182 S.E.2d at 685.

In the only case in which it was called upon to give effect to § 143(c), the Supreme Court of Georgia, likewise, found that foreign municipal ordinances no longer had to be pleaded and proved as matters of fact before being admitted into evidence. Morgan v. Reeves, 226 Ga. 697, 177 S.E.2d 68 (1970).

## III. APPLICATION OF FLORIDA LAW

■ Applying Florida law to the case at bar, as a Georgia court would be bound to do, the court finds that Hartford's obligation to defend Hickory in the suit by the original plaintiff cannot be determined by the allegations in the original complaint.

In support of its contrary position, defendant cites Battisti v. Continental Casualty Co., 406 F.2d 1318 (5th Cir. 1969). In that case, a particularly egregious instance of lawyer malpractice, the court found that the obligations of the insurance company to defend Battisti in a suit alleging "an overall fraudulent scheme," was governed by the "basic rule, well settled in Florida, and generally in all jurisdictions, that:

'An insurer's duty to defend an action against the insured is measured in the first instance, by the allegations in the plaintiff's pleadings, and if such pleadings state facts bringing the injury within the coverage of the policy the insurer must defend, irrespective of the insured's ultimate liability to the plaintiff.' 7A Appleman, Insurance Law and Practice § 4683, at 436 (2d ed. 1962). (Emphasis added) . . ."

"This pleading rule," said the court, "is equally applicable whether the insurer is invoking a general liability provision or, as here, an exclusion provision." 406 F.2d at 1321.

Defendant fails to note, however, that the "basic rule" in Florida, both at the time Battisti was decided and presently, is by no means as rigid as the Court of Appeals suggests.[7] The two Florida

---

7. There is also some question as to how generally accepted the rule, as announced in Battisti, actually is. It is certainly not accepted in Georgia, Loftin v. United States Fire Ins. Co., 106 Ga.App. 287, 127 S.E.2d 53 (1962). Nor is it apparently accepted in Texas, Travelers Ins. Co. v. Reed Co., 135 S.W.2d 611 (Tex.Civ.App.1939), or Nebraska, Babcock & Wilcox Co. v. Parsons Corp., 430 F.2d 531 (8th Cir. 1970). As the Court of Appeals said in Babcock & Wilcox, "Specificity is no longer a requirement for a complaint filed pursuant to the rules [of Federal Civil Procedure] . . . It of course follows that 'notice' pleading permit-

ted under the federal rules makes difficult application of the principle that the insurer's duty to defend is to be determined by the plaintiff's complaint—a doctrine which was developed when pleadings were considerably more specific. This problem has not gone unnoticed by the courts and commentators. E. g., Lee v. Aetna Casualty & Surety Co., 178 F.2d 750 (2d Cir. 1949) ; Milliken v. Fidelity & Casualty Co., 338 F.2d 35 (10th Cir. 1964) [other citations omitted]. However, our research indicates that the courts have generally placed the burden of uncertainty as to the policy's coverage on the insurer. Where the allegations of plaintiff's

cases cited in *Battisti* in support of the rule are Bennett v. Fidelity & Casualty Co. of N. Y., 132 So.2d 788 (Fla.App. 1961), and Consolidated Mutual Insurance Co. v. Ivy Liquors, Inc., 185 So.2d 187 (Fla.App.1966). In addition to containing similar statements of the "rule", the two cases involved detailed complaints, setting forth with much greater specificity than is found in federal notice pleadings, the facts which the insurers considered to relieve them of their obligations to defend. Subsequent to *Bennett* and *Ivy* the Florida Court of Appeals had occasion to consider a case involving a six-page complaint containing conclusory allegations that certain activities performed by the law firm of Icard, Merrill, Cullis & Timm were fraudulent and dishonest. The insurer, St. Paul Fire and Marine Insurance Company, defended its failure to perform under its malpractice policy contending that, "the 'acts or omissions' of Icard in the alleged representation of [plaintiff's] complaint were 'dishonest, fraudulent, criminal or malicious' and therefore were excluded from the coverage of the policy." St. Paul Fire & Marine Insurance Co. v. Icard, Merrill, Cullis & Timm, 196 So.2d 219, 221 (Fla. App.1967) [hereinafter *"St. Paul"*]. The Court of Appeals held against the insurer in *St. Paul* and in so doing made the following observations:

> "The provisions of a policy of insurance which tend to limit or avoid liability are to be construed most liberally in favor of the insured and strictly against the insurer. Poole v. Travelers Ins. Co., Fla.1937, 130 Fla. 806, 179 So. 138 [other citations omitted]. *General allegations of conspiracy are inadequate; the allegations must be clear, positive and specific.* [Citations omitted, emphasis supplied.]

> "Even *statements of fact* made in a pleading filed in a law suit, however false and malicious they may be, are considered to be absolutely privileged

under the law of libel, so long as they are reasonably connected with or material to the 'cause in hand.' . . . And such absolute privilege in judicial proceedings obtains to defamatory *testimony* by a witness, though given maliciously and with knowledge of its falsity, so long as it is 'material to the inquiry.' . . . These observations are pertinent because they point up the proposition that total reliance upon any statement or accusation oral or written in a judicial proceeding is hardly warranted or justified. It is, at best, a most risky business." At 221–222.

In the present case, the original complaint sets forth six counts in eight pages, each count concluding with the formalistic allegation: "All of the foregoing acts of defendants have been and continue to be committed wilfully, deliberately and in bad faith." The allegation of bad faith and wilfulness in connection with Hickory's alleged deceptive advertising is wholly conclusory and unsupported by specific factual allegations in the complaint.

Defendant maintains that this allegation of wilfulness voided its obligation to defend Hickory in light of the insurance contract which defines an insured "occurrence" as "an accident which takes place during the policy period, or that portion within the policy period of a continuous or repeated exposure to conditions, which causes *personal injury, property damage or advertising liability* neither expected nor intended by the *insured.*"

The court disagrees. The "short, plain statement" of the original plaintiff's complaint, containing stylized allegations of wilfulness, does not establish on its face that Hickory's conduct was excluded from coverage. This being so, the two most recent Florida cases on point, *St. Paul, supra*, and Tennessee Corp. v. Lamb Brothers Construction Co., 265 So.2d 533, 537–538 (Fla.App.

---

complaint, albeit ambiguous, state a claim which is potentially or arguably within the policy's coverage, the insurer must accept

defense of the claim. [Citations omitted.]" 430 F.2d 536.

1972), indicate that the Florida Supreme Court would look to see whether the objective facts of the lawsuit bring the suit within the coverage of the policy.[8] *See also* Rowell v. Hodges, 434 F.2d 926 (5th Cir. 1970).

Hartford's obligation to defend on its contract with Hickory depends therefore on whether the underlying facts show that the alleged wrongful conduct caused advertising liability which was either "expected" or "intended" by Hickory. There remains in this lawsuit a genuine issue of material fact which will require further argument, and

For this reason the respective motions for summary judgment are denied.

---

8. In Tennessee Corp. v. Lamb Bros. Const. Co., *supra*, whether the insurance company, Hartford Accident and Indemnity Company, was liable on its policy depended on whether plaintiff's activity which caused the accident was characterized as "clearing" or "gradings." Said the court, "[S]ince the allegations in the *complaint* do not initially solve the question posed in this case, we believe the responsibility *vel non* to defend must now depend solely on the operation which, assuming causal connections, was *in fact* being performed at the time of the accident. If that operation was grading, which is within the exclusion, there was no duty to defend; if it was a non-excluded aspect of land clearing then the insurance company declined to defend at its own risk, and it would now be liable for the costs of such defense because under its contract it should have defended. We now see the importance in this case of making a determination of how and under what circumstances the accident in fact occurred, and the cause must be remanded for such a determination." At 538.